United States Court of Appeals,

Fifth Circuit.

Nos. 94-30251, 94-60706.

Christopher PAVONE, Plaintiff-Appellant,

v.

MISSISSIPPI RIVERBOAT AMUSEMENT CORPORATION, et al., Defendants-Appellees.

Kathleen L. KETZEL, Plaintiff-Appellant,

v.

MISSISSIPPI RIVERBOAT AMUSEMENT, LTD., Defendant-Appellee.

May 19, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Appeal from the United States District Court for the Southern District of Mississippi.

Before WISDOM, WIENER and PARKER, Circuit Judges.

WIENER, Circuit Judge:

The appeals we hear in consolidation today are brought by two plaintiffs-appellants who claim that they were injured while working on a Jones Act vessel, but whose claims were dismissed on summary judgments rendered by different district courts. Both claims arose in the context of the dockside casino facet of the burgeoning gaming industries in two of the states of this circuit. In our plenary review of the district courts' summary judgments, we exercise our authority to affirm for reasons differing somewhat from those of the trial courts.

I

FACTS AND PROCEEDINGS

A. PAVONE

In the first of the cases we review today, Plaintiff-Appellant Christopher Pavone filed suit in Louisiana state court against Defendants-Appellants, Mississippi Riverboat Amusement Corporation, et al. (Riverboat Companies), alleging a work-related accident and seeking recovery under the Jones Act[1] for disablement, lost wages, impairment of future earning capacity, mental and physical pain and suffering, and loss of enjoyment of life. In addition to compensatory damages, Pavone seeks punitive damages and attorneys' fees.

Pavone maintains that he was employed as a bartender on the BILOXI BELLE, a floating dockside casino moored in Biloxi, Mississippi, and claims that he injured his foot during the course and scope of his employment while working at a related restaurant located dockside of the BILOXI BELLE. In particular, Pavone alleges that he stepped on a screw, which penetrated his shoe and punctured his foot, at a time when the BILOXI BELLE was being prepared for its grand opening, scheduled for the following day.

The Riverboat Companies were served with process on or about September 16, 1993, after which they timely removed the case to federal court for the Eastern District of Louisiana on October 12, 1993. More than thirty days later, on November 15, 1993, Pavone filed a motion to remand, contending that his Jones Act case was not removable. Fifteen days thereafter the Riverboat Companies

_____

[1]46 U.S.C.App. § 688 (1988).

filed a motion for summary judgment, insisting that the BILOXI BELLE was neither a Jones Act vessel nor "in navigation" at the time of Pavone's alleged accident.

On December 20, 1993, the district court denied Pavone's motion to remand, apparently concluding, inter alia, that the motion was untimely, and on February 16, 1994, the court denied Pavone's motion for reconsideration. Twice the court granted Pavone continuances, but eventually granted the Riverboat Companies' motion for summary judgment, holding, as a matter of law, that the BILOXI BELLE was not a Jones Act vessel.

Pavone's timely filing of a notice of appeal led to this review, in which he assigns the following as points of reversible error: (1) his motion to remand was not untimely when filed within thirty-three days following the filing by the Riverboat Companies of their notice of removal; (2) his suit comprised a nonremovable Jones Act claim; (3) the "saving to suitors" clause prohibits removal of state court maritime actions; (4) his last motion to continue the Riverboat Companies' motion for summary judgment should have been granted; and (5) the BILOXI BELLE and similar floating casinos are either conventional vessels or special purpose craft, in either case satisfying requirements for vessel status under the Jones Act.

B. KETZEL

Plaintiff-Appellant Kathleen L. Ketzel alleges that she was injured while working as a cocktail waitress on the BILOXI BELLE and filed suit in federal court for the Southern District of

3

Mississippi against her employer, one of the Riverboat Companies, Defendant-Appellee, Mississippi Riverboat Amusement, Ltd. (Mississippi Riverboat Amusement). Ketzel seeks recovery under the Jones Act and the general maritime law for severe injuries to her knee, which she claims occurred when she tripped over a garbage can lid and fell during the course and scope of her employment aboard the BILOXI BELLE.

In April 1994, Mississippi Riverboat Amusement filed a motion for summary judgment, contending that Ketzel was not a seaman when she was injured on the BILOXI BELLE because it was not a vessel in navigation under the Jones Act or the general maritime law. Ketzel filed her own summary judgment motion, which Mississippi Riverboat Amusement answered by filing a motion seeking an extension of time within which to respond, which the district court granted. Several months later, the district court also granted Mississippi Riverboat Amusement's summary judgment motion, concluding that, as a matter of law, the BILOXI BELLE "is nothing but a "floating casino' ... not a "vessel' under the Jones Act."[2] Ketzel timely filed her notice of appeal.

---

[2]In *Preston O. King v. The President Riverboat Casino-Mississippi, Inc.,* No. 1:94CV233GR (Mar. 10, 1995), the same district court that decided *Ketzel,* held that it lacked admiralty subject matter jurisdiction over a claim by a plaintiff who alleged that he was injured aboard a floating casino that is essentially identical to the BILOXI BELLE. The plaintiff argued that he was entitled to "passenger" status under the Jones Act, but the district court disagreed, holding that a floating casino is not a Jones Act vessel *and* that the activity associated with the alleged injury (*i.e.,* dockside gaming) lacked a sufficient nexus to traditional maritime activity to confer admiralty jurisdiction on the court.

C. THE BILOXI BELLE

1. *History*

The structure now known as the BILOXI BELLE is situated on a barge that was constructed at Morgan City, Louisiana, for the express purpose of supporting a floating restaurant and bar that was to be located at Corpus Christi, Texas. In preparation therefor, the completed barge was towed from Morgan City to a shipyard in Rockport, Texas, where the restaurant structure was added and the name WAYWARD LADY was affixed. The WAYWARD LADY was towed from Rockport to Corpus Christi, where it was operated as a restaurant and bar, as originally contemplated. After a while, the WAYWARD LADY was moved from Corpus Christi to Aransas Pass, Texas, where it remained moored for approximately two and a half more years before being re-outfitted as a casino, towed to Biloxi, and renamed the BILOXI BELLE.

In preparation for its use as a dockside floating casino, the BILOXI BELLE was moored to shore by lines tied to sunken steel pylons that were filled with concrete. The first level of the BILOXI BELLE was connected to the pier by steel ramps, and the second level was joined to a shore-side building. In addition, numerous shore-side utility lines—telephone, electric, gas, sewer, domestic fire and water, cable TV, and computer—were connected permanently (or at least indefinitely) to the BILOXI BELLE. Only by removing steel pins from the ramps and letting loose all lines and cables could the BILOXI BELLE be disconnected from the shore.

2. *Vessel Features*

The barge upon which the casino structure of the BILOXI BELLE rests has a steel hull, a raked bow to facilitate its being towed, bilge pumps, functional ballast tanks, an auxiliary generator to supply emergency electrical power, and below-deck features including storage facilities and a galley for employee meals and work breaks. It is 217 feet long, 44 feet wide, has a 10-foot draft, and a gross and net tonnage of 2587 tons. The barge is documented by the United States Coast Guard, is assigned an official registration number, is authorized to engage in the coastwise trade, is approved to undertake voyages between ports of the United States with no restrictions, and is home-ported in New Orleans. In addition, an engineer from the American Bureau of Shipping Marine Services, Inc. reviewed the stability of the BILOXI BELLE and rendered an evaluation of the "vessel's intact stability." The BILOXI BELLE Casino is licensed for gaming by the Mississippi Gaming Commission pursuant to the Mississippi Gaming Control Act, which allows such licenses to be issued only to operators of "vessels" or "cruise vessels." A continual stand-by towing contract with Alario Brothers Towing commits that company to supply the equipment, facilities, and expertise required to tow the BILOXI BELLE to sheltered waters in the event potentially damaging weather is forecast. (The BILOXI BELLE was towed to sheltered waters on August 23, 1992, when Hurricane Andrew threatened.)

3. *Nonvessel Features*

The BILOXI BELLE has no engine, no captain, no navigational aids, no crewquarters and no lifesaving equipment. For visual

effect only, the BILOXI BELLE is outfitted with a decorative pilot house containing no operating parts other than a single light switch. This faux pilot house contains no steering mechanism, but is decorated with an antique wheel for purely aesthetic purposes. Decorative ring buoys are located on the BILOXI BELLE, but they too are purely visual effects and are not intended for lifesaving use.

Likewise, a motorized but nonfunctional paddle wheel is affixed to the BILOXI BELLE. The paddle wheel is turned by a small engine, and water outlets around the wheel produce spray to give the appearance of function, but the wheel rests permanently above the water level and serves no propulsion function.

Despite having been towed from its place of manufacture in Louisiana to two restaurant and bar locations in Texas and eventually to its dockside casino location in Biloxi, the subject barge has never been used as a seagoing vessel to transport passengers, cargo, or equipment across navigable waters. Neither was it originally constructed to do so. Even though the barge floats on navigable waters, its quite substantial dockside attachment to land is indefinite, if not permanent, save only for its ability to be unmoored and towed to sheltered waters in advance of approaching hurricanes or other violent weather. The BILOXI BELLE employs no navigational or nautical crew; all workers thereon are employed solely in connection with the casino operation.

II

ANALYSIS

A. Standard of Review

Both cases consolidated here on appeal were terminated in the district courts by summary judgments in favor of the Defendants-Appellees. We review de novo a district court's grant of summary judgment.[3] In so doing, we determine whether "all of the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[4] The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial.[5] We view this evidence, and the inferences to be drawn from it, in the light most favorable to the nonmovant.[6]

B. Seaman Status

To recover under either the Jones Act or the general maritime law, a plaintiff must be a "seaman."[7] The determination of

---

[3]*Simpson v. Lykes Bros. Inc.,* 22 F.3d 601, 602 (5th Cir.1994).

[4]Fed.R.Civ.P. 56(c).

[5]*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

[6]*Unida v. Levi Strauss & Co.,* 986 F.2d 970, 975 (5th Cir.1993).

[7]*Hebert v. Air Logistics, Inc.,* 720 F.2d 853, 856 (5th Cir.1983).

8

"seaman" status is generally one of fact.[8] "However, seaman status may be decided on summary judgment where the evidence does not support a finding, as a matter of law, that the claimant is permanently assigned to a Jones Act vessel."[9] The substantive issue at the core of both cases that we review today is whether the BILOXI BELLE is a Jones Act vessel or was one at the times when the subject accidents are alleged to have occurred. Albeit for reasons different from those expressed by the district courts, we agree with their conclusions that the BILOXI BELLE was not a vessel in navigation for purposes of the Jones Act at the pertinent times. Consequently, neither Pavone nor Ketzel was a seaman, and summary judgment against them both was proper.

C. PRELIMINARY MATTERS

Although the discrete facts of the instant cases are essentially undisputed, and the substantive claims of each Plaintiff-Appellant are of essentially the same type and turn on the question of the BILOXI BELLE's status as a Jones Act vessel, Pavone raises additional points of error, primarily procedural in nature, that Ketzel does not assert. There is nothing unique or particularly significant about the procedural errors advanced by Pavone. Were it not for his contention that the BILOXI BELLE is a vessel in navigation for Jones Act purposes, Pavone's case would almost certainly have been decided on our summary calendar in an

---

[8]*Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 292 (5th Cir.1990).

[9]*Id.*

unpublished per curiam opinion.   But these lesser procedural
attractions are presently before us, so we shall address them
before proceeding to the main event.

1. *Motion To Remand to State Court*

Pavone claims that the district court erred in denying his
motion to remand his suit to the state court in which it was
originally filed.   The district court did not favor us with its
specific reasons for denying Pavone's motion;   rather, it simply
observed that the record did not warrant a remand.   On appeal
Pavone advances two points of error to support his claim that he
was wrongly denied remand.

a. *Timeliness of Motion To Remand*

Pavone first claims that his motion to remand was timely made.
We review the timeliness of a remand motion de novo.

Section 1447(c) provides that a "motion to remand the case on
the basis of any *defect in removal procedure* must be made within 30
days *after the filing* of the notice of removal under § 1446(a)."[10]
Pavone's motion to remand was filed thirty-three days after the
Riverboat Companies filed their notice of removal and mailed a copy
of that notice to Pavone.   He states that six days elapsed between
the date the notice of the removal was filed and the date on which
he received his copy in the mail.   He contends therefore that (1)
he *could* have filed a motion for enlargement of time or to have his
pleading deemed timely filed, either of which motions the district
court *could* have granted;   and (2) § 1446(d) requires the removing

_____

[10]28 U.S.C. § 1447(c) (emphasis added).

10

party to provide "prompt" written notice, and due process requires that his (Pavone's) motion be treated as timely under the circumstances of the mailing and delivery.  Pavone also cites as persuasive authority *Chott v. Cal Gas Corp.*,[11] a decision in which a district court in Missouri held timely a motion to remand which, like Pavone's, was filed thirty-three days after the opposing party had filed and mailed its notice of removal.[12]  The *Chott* court found the motion timely by applying Federal Rules of Civil Procedure 6(e), which provides that "3 days shall be added to the prescribed period" whenever a party is required to "do some act" within a prescribed period "after the service of a notice or other paper upon the party and the notice is served upon the party by mail."[13]

The Riverboat Companies respond that Rule 6(e) is unavailing to Pavone, as it applies only when the prescribed period for a party to act begins to run *after service upon that party;*  by contrast, § 1447(c) establishes the time to object to a defect in a removal procedure based on when the removal notice is *filed with the court.*  As Pavone did not file his objection within thirty days following the filing of the renewal notice, the Riverboat Companies conclude that Pavone waived any objection to defects in the removal procedure.

We agree with the Riverboat Companies that Rule 6(e) does not extend the thirty-day period of § 1447(c), as that rule applies

---

[11]746 F.Supp. 1377 (E.D.Mo.1990).

[12]*Id.* at 1377.

[13]FED.R.CIV.P. 6(e).

11

only when a party is required to act within a prescribed period after *service,* not after *filing.* As we observed ten years ago in *Lauzon v. Strachan Shipping Co.,*[14]

> [t]he correct inquiry is whether the required actions must be performed within a prescribed period of *filing* or of *service.*—If the action is to be taken after filing, the time for action begins to run from that date. If the act is to be taken from service, the three day extension of ... [Rule] 6(e) applies.[15]

Furthermore, a district court has no discretion to remand to state court when a motion to do so is grounded on improper removal procedures and that motion is not made within thirty days following *filing:* Under such circumstances, the objection to removal jurisdiction resulting from a defect in the removal procedure is waived.[16] Defects in removal procedure include, inter alia, the removal of an action that could have been filed originally in federal court but could not be removed to federal court if it were filed originally in state court.[17] As Pavone could have filed his Jones Act claim in federal court originally, as did Ketzel, it is clear that Pavone's motion to remand does not implicate the subject matter jurisdiction of the district court, which cannot be waived. On the contrary, Pavone's motion involves only a defect in removal procedure which, as noted, is waivable. Although in neither

---

[14]782 F.2d 1217 (5th Cir.1985).

[15]*Id.* at 1220 (emphasis in original).

[16]*See In re Shell Oil Co.,* 932 F.2d 1523, 1529 (5th Cir.1991).

[17]*Baris v. Sulpicio Lines, Inc.,* 932 F.2d 1540, 1544 (5th Cir.1991), *cert. denied,* 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 449 (1991).

12

*Lauzon,*[18] nor elsewhere do we appear to have directly addressed the interplay, or lack thereof, between Rule 6(e)'s three-day extension and § 1447(c)'s thirty-day provision, we perceive no meaningful distinction between this case and *Lauzon,* the decision in which we drew the line limiting Rule 6(e)'s application to periods measured from time of service upon a party.

b. *Removability of Jones Act Suit*

Next Pavone raises several arguments as to why his Jones Act suit was not removable.  These contentions, however, all go to the merits of his motion to remand.  But we have already determined that Pavone's motion to remand merely concerned a defect in the removal procedure;  that the defect therefore was waivable;  and that Pavone, in fact, waived that defect by failing to file his remand motion within thirty days following the filing of the notice of removal.  Consequently, Pavone also waived these assignments of error;  thus they are not properly before us.

2. *Denial of Motion To Continue Summary Judgment Motion*

Pavone complains that the district court abused its discretion in denying his motion to continue the hearing on the Riverboat Companies' motion for summary judgment until after the court ruled on his motion to remand.  We review for abuse of discretion a district court's denial of a continuance.[19]

---

[18]*Lauzon,* 782 F.2d at 1220;  *see also Lewis v. Certainteed Corp.,* 870 F.Supp. 130, 131-32 (W.D.La.1994) (stating that Rule 6(e) does not extend 30 day period of § 1447(c)).

[19]*Carriere v. Sears, Roebuck & Co.,* 893 F.2d 98, 102 (5th Cir.), *cert. denied,* 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990).

We believe that the chronology of the motion practice puts the issue of Pavone's February 8, 1994 request for a continuance in clear perspective:

November 15, 1993, Pavone filed a motion to remand;

November 30, 1993, the Riverboat Companies filed a motion for summary judgment;

December 15, 1993, the court heard Pavone's remand motion;

December 20, 1993, the court denied Pavone's remand motion;

January 3, 1994, Pavone filed a motion for reconsideration;

January 26, 1994, the court heard Pavone's reconsideration motion;

February 8, 1994, Pavone filed a motion to continue the hearing on the Riverboat Companies' summary judgment motion;

February 16, 1994, Pavone's motion for reconsideration was denied;

February 22, 1994, the district court heard the Riverboat Companies' motion for summary judgment—which had been continued from December 15, 1993 to February 9, 1994 on Pavone's motion, and from February 9, 1994 to February 22, 1994 on the court's own motion.

As this makes clear, the district court ruled against Pavone on his motion to remand on December 20, 1993 and denied his motion for reconsideration of that decision on February 16, 1994—*before* the district court heard the Riverboat Companies' motion for summary judgment.[20]

Pavone further insists that he was presented with a Catch-22

---

[20]Pavone's plea that "judicial economy" demands that a district court definitively rule on a motion to remand a suit brought under the Jones Act before entertaining a motion for summary judgment in that suit is inapposite when, as here, the dispositive issue in *both motions* is whether the structure at issue is a Jones Act vessel.

14

by the district court's failure to grant a continuance of the Riverboat Companies' motion for summary judgment until after the court had issued its final ruling on his motion to remand the case to state court. Pavone claims that he could not conduct discovery prior to obtaining a ruling on his motion to remand without risking the waiver of that right; but neither could he oppose the Riverboat Companies' motion for summary judgment without obtaining information that he could gather only through discovery.

In claiming that he would have risked his right to remand had he conducted discovery, Pavone relies on *Roberts v. Vulcan Materials, Co.,*[21] a 1983 decision from a Louisiana district court. In that decision, the district court noted that a plaintiff had actively participated in the discovery process and thereby acquiesced to federal jurisdiction, waiving any objection he might have otherwise had to procedural defects in the removal process. Pavone's reliance on *Roberts* is misplaced, however, as § 1447 was amended in 1988, changing the determinative question from whether a plaintiff "acquiesced" in federal jurisdiction to whether the motion to remand was timely filed. Under the foregoing circumstances and analysis, we find no abuse of discretion in the district court's denial of Pavone's motion to continue the hearing on the Riverboat Companies' motion for summary judgment.

D. JONES ACT VESSELS: YEA OR NAY?

Again, as both Pavone and Ketzel depend for recovery on the ability to sustain their claims to having been Jones Act "seamen"

---

[21]558 F.Supp. 108 (M.D.La.1983).

when they were injured, and as the BILOXI BELLE was concededly situated on navigable waters at the times when the subject accidents are alleged to have occurred, thereby meeting the "situs" test for Jones Act purposes, the core question is whether the "status" of the BILOXI BELLE was that of Jones Act vessel at the times in question. And in the context of indefinitely moored floating casinos, that question is *res nova* in this circuit.[22] With the assistance of able counsel, our esteemed colleagues of the Southern District of Mississippi and the Eastern District of Louisiana, respectively, have rendered opinions in the instant cases crafted in classical maritime methodology for determining, on the basis of a watercraft's unique physical and functional attributes, whether such a craft—here the BILOXI BELLE—is a "vessel," conventional or nonconventional, for purposes of the Jones Act or the general maritime law. We are not prepared to say that either opinion is flawed; that the analysis in either is erroneous; or that the result reached on the narrow question whether the BILOXI BELLE was a Jones Act vessel vis-à-vis Pavone and Ketzel at the times their accidents occurred is wrong. We have nagging concerns nevertheless that vessel analyses of the kinds performed by the district courts in the instant cases could be

---

[22]With the recent and presumably continuing proliferation of such "gaming" establishments in Louisiana and Mississippi, and the question of legalized casino gaming still being openly discussed and debated in Texas, we speculate that the cases we consider today are merely the vanguard of a host of future legal efforts to advance as maritime causes of action all sorts of personal injury and property damage claims arising from occurrences on or near moored floating casinos and similar establishments.

16

overbroad, albeit through inadvertence, and thereby return to haunt us in slightly differing contexts in the future.[23]  We conclude that the correct result reached by the district courts in these cases can be achieved in a narrower—and thus a jurisprudentially more principled—way, thereby avoiding the potentiality of undesirable future side effects.

The approach to which we refer comprehends the analysis of putative "vessels" that were either withdrawn from navigation at the time in question or never placed in navigation.  In particular, we examine the status of the BILOXI BELLE as of the times pertinent to the alleged injuries in these cases to determine if it was a Jones Act vessel—assuming arguendo that the subject craft was built and used for nonvessel purposes, was moored other than temporarily to the bank, and either had been "withdrawn from navigation" or was being used as a "work platform," or both.[24]

The concepts of "withdrawn from navigation" and "work platform," both usually eschewing vessel status, are not

---

[23]For example, whether floating casinos, bars, restaurants, etc. would be Jones Act vessels for purposes of accidents occurring while they were being towed to a new location or to a shipyard or dry dock for work or repairs or to sheltered waters in avoidance of a hurricane.  The approach we adopt *infra* also avoids the conflict in "vessel" status among the Jones Act, the general maritime law, state casino licensing classification, Coast Guard documentation, and "dictionary" definitions.

[24]In limiting our consideration to vessels withdrawn from navigation or being used as work platforms, we also avoid the always problematic issue of special purpose vessels.  *See, e.g., Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 293 (5th Cir.1990) ("Nevertheless, exotic craft may qualify as vessels, especially if frequently navigated, or if exposed to the perils associated with maritime service, or if injury occurs during ocean transport.").

17

infrequently intertwined. The withdrawn-from-navigation idea has been recognized for decades, distinguishing craft or structures that meet the general dictionary definition of "vessel" from those that meet Jones Act or the general maritime law vessel status at a given time, such as when the craft or structure has been " "laid up for the winter.' "[25] Both that concept and the work-platform concept are certainly alive and well in this circuit, as perhaps best illustrated by a triumvirate of relatively recent decisions.

In the 1984 Jones Act case of *Bernard v. Binnings Construction Co.,*[26] the "vessel" in question was a small raft or "work punt" stationed alongside a piling that was being driven near the shore of a canal. We noted first the teachings of our earlier cases establishing that dry docks and analogous structures of which the primary purpose is to provide a work platform—even if the structures are afloat—are not Jones Act vessels, as a matter of law.[27] In *Bernard,* we recognized that:

> In a line of cases beginning with *Cook v. Belden Concrete Products,*[28] we have extended [the rationale that a floating dry dock is not a "vessel" while moored at the bank and operated as a dry dock], by analogy, to structures that lack the permanency of fixation to shore or the bottom that is

---

[25]*Desper v. Starved Rock Ferry Co.,* 342 U.S. 187, 191, 72 S.Ct. 216, 218, 96 L.Ed. 205 (1952) (quoting *Hawn v. American S.S. Co.,* 107 F.2d 999, 1000 (2d Cir.1939)).

[26]741 F.2d 824 (5th Cir.1984).

[27]*Id.* at 830 & n. 21.

[28]472 F.2d 999 (5th Cir.) (finding that floating construction platform moored alongside employer's concrete yard is legally indistinguishable from floating dry docks and holding it not to be a Jones Act vessel, as matter of law), *cert. denied,* 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973).

18

common to dry docks, but nonetheless are used primarily as work platforms.[29]

The *Bernard* court then laid out what has become the starting point in this circuit for analyzing such work-platform cases:

> Since *Cook* we have, despite our reluctance to take Jones Act claims from the trier of fact, affirmed findings that, as a matter of law, other floating work platforms are not vessels. A review of these decisions indicates three factors common to them: (1) The structures involved were constructed and used primarily as work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.[30]

The next case in our trilogy is *Ducrepont v. Baton Rouge Enterprises, Inc.,*[31] in which we were called on to classify a structure as a vessel or nonvessel under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA)[32] as well as under the Jones Act and the general maritime law. In *Ducrepont,* we slightly expanded one element of the *Bernard* test by recognizing that a structure could meet the work-platform definition under the *Bernard* factors even if it had not originally been constructed for that purpose, as long as it was used primarily as a work platform at the time in question and met the other *Bernard* factors.[33]

---

[29]*Bernard,* 741 F.2d at 830.

[30]*Id.* at 831.

[31]877 F.2d 393 (5th Cir.1989).

[32]33 U.S.C. § 905(b) (1988).

[33]*Ducrepont,* 877 F.2d at 395.

19

Then came *Gremillion v. Gulf Coast Catering Co.,*[34] in which we heeded the lesson of our earlier decision in *Blanchard v. Engine & Gas Compressor Servs., Inc.,*[35] stating that, "[a]s a general principle, where the vessel status of an unconventional craft is unsettled, it is necessary to focus upon the "purpose for which the craft is constructed and the business in which it is engaged.' "[36] We then proceeded in *Gremillion* to reinforce the *Bernard* analysis as follows:

> Our decisions in this area instruct, however, that as a matter of law certain dry docks and floating work platforms will not qualify as Jones Act vessels. [citing in a footnote, examples from our prior jurisprudence: floating platform used for cleaning and stripping; repair barge; oil production platform that had not moved for twenty-four years; gulf rig moved only twice in twenty years; small raft-like work platform used to drill pilings; floating work platform used in unloading grain barges.] A survey of the case law demonstrates three common attributes for nonvessels:

(1) The structure was constructed to be used primarily as a work platform;

(2) the structure is moored or otherwise secured at the time of the accident; and

(3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.[37]

When the undisputed facts of the instant cases are plugged

---

[34]904 F.2d 290 (5th Cir.1990).

[35]575 F.2d 1140 (5th Cir.1978).

[36]*Gremillion,* 904 F.2d at 293 (quoting *Blanchard,* 575 F.2d at 1142).

[37]*Id.* at 293-94 (citing *Daniel v. Ergon, Inc.,* 892 F.2d 403, 407 (5th Cir.1990) (citing *Bernard v. Binnings Constr. Co.,* 741 F.2d 824, 831 (5th Cir.1984))).

into (1) the *Desper/Hawn* withdrawn-from-navigation factors, or (2) the *Bernard/Gremillion* work-platform attributes, or both, and are compared to the functional and nautical characteristics and mooring statuses of the various craft that in earlier cases were held as a matter of law to be nonvessels for Jones Act purposes, there can be little doubt that indefinitely moored, shore-side, floating casinos, such as the BILOXI BELLE, must be added to that list. Here, the semi-permanently or indefinitely moored barge supporting the BILOXI BELLE casino was constructed ab initio to be the floating site of a restaurant and bar (not a key factor given *Ducrepont* 's recognition that original construction as a work platform is not a prerequisite).[38] From its inception the instant barge was used first as a floating restaurant and bar until its conversion to a casino and its renaming as the BILOXI BELLE, after which it has been used only for casino purposes. Upon its arrival in Mississippi from Texas, the BILOXI BELLE was moored to the shore in a semi-permanent or indefinite manner, and continued to be thus moored before, during, and after the accidents in question. The BILOXI BELLE is susceptible of being moved, and in fact was moved across navigable waters one time in the course of "normal operations" (assuming that movement to avoid the threat of a hurricane on a single occasion can be deemed "normal operations"), which one-time movement was purely incidental to the barge's primary purpose of physically supporting a dockside casino

---

[38] *Ducrepont v. Baton Rouge Enters., Inc.*, 877 F.2d 393, 395 (5th Cir.1989).

21

structure.

We hold, therefore, that at the times of the Pavone and Ketzel accidents, the BILOXI BELLE (1) was removed from navigation, and (2) was a work platform. Under either circumstance, it was not then a vessel for purposes of the Jones Act or the general maritime law.

For the foregoing reasons, the summary judgments in the cases consolidated for review herein are, in all respects,

AFFIRMED.