239 B.R. 737 (1999)
In re AMGAM ASSOCIATES, Debtor.
In re American Gaming And Resorts Of Mississippi, Inc. d/b/a Chapter 11, American Gaming Corporation, Debtor.
v.
Alan D. Alario, Inc., Plaintiff,
v.
American Gaming And Resorts Of Mississippi, Inc. d/b/a, Gold Coast Casino, Defendant.
Bankruptcy Nos. 95-07864-SEG, 95-08081-SEG. Adversary No. 97-1080.
United States Bankruptcy Court, S.D. Mississippi.
October 19, 1999.
JERRY A. BROWN, Bankruptcy Judge.

MEMORANDUM OPINION
This matter was set for trial on July 23, 1999. On that date, the parties announced that they had reached a settlement in all respects except for the limited issue of whether the GOLD COAST CASINO was a vessel subject to a maritime lien at the time Alan D. Alario Inc. towed it from the *738 construction site to its permanent berth.[1] The court approved the settlement, and took this limited issue under advisement.
The court has considered the record, memoranda, and exhibits, and finds that the GOLD COAST CASINO was a vessel during the time when it was under tow and struck the fenders on two different bridges.

I. Factual background

The GOLD COAST CASINO barge was built at Pearlington, Mississippi in 1993 by Gulf Coast Fabrication, Inc. for the debtor, American Gaming Corp. ("American Gaming"). The barge was then towed to the McDermott shipyard facility in Back Bay Biloxi, where the superstructure was constructed on the barge. This special purpose craft was designed for and intended to be used as a gambling casino on the Mississippi Gulf Coast.
Debtor, American Gaming and Resorts of Mississippi, Inc. ("AGRM"), contracted with Alan D. Alario, Inc. ("Alario") to provide tugs on an hourly basis, homeport to homeport, for towage of the GOLD COAST CASINO barge from Back Bay Biloxi to its indefinite, if not permanent, mooring site at 771 Beach Boulevard, Biloxi, Mississippi, and for assistance in shifting the barge at its berth prior to towage, on a flat rate basis.
Alario provided the tugs MISS BARBARA, BAYOU EAGLE, and LADY LISA, which tugs began towing the GOLD COAST CASINO on May 9, 1994. While attempting to go under the I-110 bridge span, the GOLD COAST CASINO hit the southwest bridge fender system, causing damage to the fender system and the facade of the casino barge.
The flotilla stopped at Big Island and waited for favorable wind, tide, and daylight. At 6:00 a.m. on May 10, 1994, the flotilla departed Big Island, but returned when the starboard main engine of the lead tug, MISS BARBARA, broke down.
AGRM then contracted with Gulf Marine Towing, Inc. to provide a replacement tug and an additional tug. The flotilla proceeded to move the GOLD COAST CASINO. While under tow, the starboard side of the GOLD COAST CASINO rubbed against the Highway 90 western bridge fender system causing damage to the facade of the casino barge.
The GOLD COAST CASINO was delivered to its mooring berth later that day on May 10, 1994.
Alario submitted an invoice to AGRM in the amount of $50,475.00. AGRM made a payment to Alario of $25,000, but withheld the balance because it claimed the damage to the GOLD COAST CASINO was the fault of Alario.
The parties stipulate that $4,000 is to be deducted from the outstanding amount claimed by Alario, resulting in a claim of $21,475.00.

II. Procedural background

On January 9, 1995, Alario filed a verified complaint and a motion for issuance of warrant for arrest with the District Court for the Southern District of Mississippi in an attempt to assert a maritime lien and to seize and sell the GOLD COAST CASINO in satisfaction of the outstanding amounts owed. Magistrate Judge John M. Roper denied Alario's motion.
On May 12, 1995, Alario moved to reconsider the denial of its original motion. On July 24, 1995, Magistrate Judge Roper denied the motion to reconsider.
On August 3, 1995, Alario objected to the magistrate judge's order. On September 11, 1995, counsel for AGRM filed a "Suggestion of Bankruptcy", and notified the district court that AGRM had filed for bankruptcy protection under Chapter 11 on June 1, 1995.
On March 18, 1996, District Judge David Bramlette: (1) denied Alario's objections to the magistrate judge's order; (2) vacated the magistrate judge's order of July 24, *739 1995 on the grounds that jurisdiction of the matter was exclusively with the bankruptcy court; and (3) dismissed the matter without prejudice for lack of jurisdiction as a result of AGRM's bankruptcy.
Alario moved to reconsider on April 3, 1996. On August 5, 1996, Judge Bramlette reinstated the matter for the limited purpose of determining whether the GOLD COAST CASINO barge was a part of AGRM's bankruptcy estate. No determination of this issue was made prior to the transfer of the matter to the United States Bankruptcy Court for the Southern District of Mississippi, by order of September 24, 1997.
The matter was set for trial before the undersigned on July 23, 1999.[2] On that date, the parties advised that they had reached a settlement in all respects except for the limited issue of whether the casino was considered a vessel subject to a maritime lien at the time of the towage.[3] The court approved the settlement, and took this limited issue under advisement.

III. Conclusions of law

AGRM argues that the GOLD COAST CASINO is not a vessel, and that the question of whether Mississippi floating casinos are vessels and subject to admiralty jurisdiction and maritime liens has been litigated and foreclosed. AGRM cites several cases in support of its position, including Pavone v. Mississippi Riverboat Amusement Corp.,[4] and In re Biloxi Casino Belle, Inc.[5]
Alario submits that the GOLD COAST CASINO was a vessel "in navigation", being towed on navigable waters at all times at issue, and is therefore subject to a maritime lien for the towage charges. Alario cites certain language in the Pavone case in support of its position.
The court is persuaded by Alario's argument. There is no question that a craft is not necessarily a vessel merely because it floats. The Fifth Circuit has established that there are certain classes of structures that float, such as dry docks and floating work platforms, that are not deemed vessels for Jones Act purposes, or most other maritime law/statutory purposes.[6] Similarly, in the case of In re Biloxi Casino Belle Inc., Bankruptcy Judge Edward Gaines held that two dockside gaming casinos, designed and intended to be permanently moored to their berths, were not vessels for purposes of federal admiralty and maritime matters and the Ship Mortgage Act, 46 U.S.C. § 30101.[7]
In Pavone, the Fifth Circuit affirmed the district court's holding that the BILOXI BELLE was not a vessel for purposes of the Jones Act. The court discussed the analysis to be used in determining whether different structures are vessels, stating:
We have nagging concerns nevertheless that vessel analyses of the kinds performed by the district courts in the instant cases could be overbroad, albeit through inadvertence, and thereby return to haunt us in slightly differing contexts in the future. [FN23.] We conclude that the correct result reached by the district courts in these cases can be achieved in a narrowerand thus a jurisprudentially more principledway, *740 thereby avoiding the potentiality of undesirable future side effects.
The approach to which we refer comprehends the analysis of putative "vessels" that were either withdrawn from navigation at the time in question or never placed in navigation. In particular, we examine the status of the BILOXI BELLE as of the times pertinent to the alleged injuries in these cases to determine if it was a Jones Act vesselassuming arguendo that the subject craft was built and used for nonvessel purposes, was moored other than temporarily to the bank, and either had been "withdrawn from navigation" or was being used as a "work platform," or both.[FN24][8]
Footnote 23 of Pavone states:
For example, whether floating casinos, bars, restaurants, etc. would be Jones Act vessels for purposes of accidents occurring while they were being towed to a new location or to a shipyard or dry dock for work or repairs or to sheltered waters in avoidance of a hurricane. The approach we adopt infra also avoids the conflict in "vessel" status among the Jones Act, the general maritime law, state casino licensing classification, Coast Guard documentation, and "dictionary" definitions.[9]
Footnote 24 states:
In limiting our consideration to vessels withdrawn from navigation or being used as work platforms, we also avoid the always problematic issue of special purpose vessels. See, e.g., Gremillion v. Gulf Coast Catering Co., 904 F.2d 290, 293 (5th Cir.1990) ("Nevertheless, exotic craft may qualify as vessels, especially if frequently navigated, or if exposed to the perils associated with maritime service, or if injury occurs during ocean transport.").[10]
The Pavone court also analyzed a line of previous Fifth Circuit cases involving the question of whether various types of work platforms were vessels.[11] The court concluded its analysis by finding three common attributes for nonvessels as follows:
A survey of the case law demonstrates three common attributes for nonvessels: (1) The structure was constructed to be used primarily as a work platform; (2) the structure is moored or otherwise secured at the time of the accident; and (3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.[12]
Consequently, Pavone recognized that one of the attributes of a structure that is not a vessel is that "the structure is moored or otherwise secured at the time of the accident".[13]
In the case at bar, at the time of the accidents, the GOLD COAST CASINO was not attached to land as was the BILOXI BELLE. Instead, it was under towage in navigable waters. The clear *741 language of the Fifth Circuit decision in Pavone, particularly in Footnotes 23 and 24, shows that while the GOLD COAST CASINO may not be a vessel when withdrawn from navigation, under the facts of this case it was a vessel because it was under tow from the construction site to its permanent berth at the time of the accident.
NOTES
[1] See Pl. 43.
[2] The undersigned is sitting in the United States Bankruptcy Court for the Southern District of Mississippi by order of the United States Fifth Circuit. The American Gaming and AGRM cases were assigned to the undersigned.
[3] See Pl. 43.
[4] 52 F.3d 560 (5th Cir.1995).
[5] 176 B.R. 427 (Bankr.S.D.Miss.1995).
[6] Pavone, 52 F.3d at 570.
[7] In re Biloxi Casino Belle Inc., 176 B.R. 427 (Bankr.S.D.Miss.1995). To the same effect, see In re Treasure Bay Corp., 205 B.R. 490 (Bankr.S.D.Miss.1997), holding that two gambling casinos permanently moored to land-based structures were not vessels for purposes of the Ship Mortgage Act.
[8] Pavone, 52 F.3d at 568.
[9] Id.
[10] Id.
[11] See Cook v. Belden Concrete Products, Inc., 472 F.2d 999 (5th Cir.1973); Bernard v. Binnings Construction Co., 741 F.2d 824 (5th Cir.1984); Ducrepont v. Baton Rouge Enterprises, Inc., 877 F.2d 393 (5th Cir.1989); Gremillion v. Gulf Coast Catering Co., 904 F.2d 290 (5th Cir.1990).
[12] Pavone, 52 F.3d at 570 [citations omitted] [emphasis added].
[13] The Fifth Circuit has recently determined that a large work spar fixed in place until the petroleum resources beneath it are exhausted, estimated to be in 15 years, was not a vessel. Fields v. Pool Offshore, Inc., 182 F.3d 353 (5th Cir.1999). The Fields decision used the same three part test, although rewording the third prong to require consideration of "whether the transportation function of the structure went beyond theoretical mobility and occasional incidental movement". 182 F.3d at 358.