IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-31455
Summary Calendar
_____

ANTHONY DUNKLIN; BENITA DUNKLIN; THERESA BUTLER, Individually and
on behalf of Lucille Griffin; SUSAN ANN CUBIE, Individually and
on behalf of Velma Griffin Cubie; GEORGE CUBIE, JR., Individually
and on behalf of Velma Griffin Cubie; CHRISTOPHER CUBIE,
Individually and on behalf of Velma Griffin Cubie; ANTHONY CUBIE,
Individually and on behalf of Velma Griffin Cubie; MARIA CUBIE,
Individually and on behalf of Velma Griffin Cubie; TIMOTHY CUBIE,
Individually and on behalf of Velma Griffin Cubie; WILLIE J.
GRIFFIN, Individually and on behalf of Lucille Griffin; PAULINE
JACKSON, Individually and on behalf of Lucille Griffin,

                                    Plaintiffs - Appellants,

 versus

LOUISIANA RIVERBOAT GAMING PARTNERSHIP, doing business as
Isle of Capri Casino; LOUISIANA DOWNS INC, doing business as Isle
of Capri Casino; C S N O INC; L R G P HOLDINGS INC; XYZ INSURANCE
COMPANY; ELLIOTT BURT; BRIAN STENZ; BRUCE PORTER; KELVIN PINESET,

                                    Defendants-Appellees.

--------------------
Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 99-CV-2354
--------------------
May 22, 2001

Before SMITH, BENAVIDES, AND DENNIS, Circuit Judges.

PER CURIAM:[*]

    Plaintiffs appeal from a dismissal of their complaint
pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter
jurisdiction.  We affirm, albeit for reasons different from those
of the district court.  See <u>United States v. Real Property</u>

_____

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

Located at 14301 Gateway Blvd. W., 123 F.3d 312, 313 (5th Cir. 1997) ("we will not reverse a judgment of the district court if it can be affirmed on any ground, regardless of whether the district court articulated the ground").

Plaintiffs brought suit against the owners of the LADY OF THE ISLE casino in the district court for the Western District of Louisiana. The LADY OF THE ISLE casino was allegedly negligent in serving Rodney Baker alcohol after he was to the point of visible intoxication. Further, a valet for the defendant gave Baker the keys to his car and allowed him to drive. After leaving the casino, the car was involved in a fatal accident killing Baker and one of his passengers. Plaintiffs sought to recover tort damages against the casino under federal admiralty law.

"'A party seeking to invoke federal admiralty jurisdiction over a tort claim must satisfy conditions both of 'location' and of 'connection' with maritime activity.'" Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey, 183 F.3d 453, 455 (5th Cir. 1999)(quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge and Dock Co., 513 U.S. 527, 531-32 (1995)). The "location prong" can be satisfied if (1) the tort occurred on navigable water or (2) the injury suffered on land was caused by a vessel on navigable water. Id. at 456.

Plaintiffs cannot satisfy the requirement that their land-based injuries were caused by a *vessel* on navigable water. The undisputed evidence submitted by the parties in support of and in opposition to the Rule 12(b)(1) motion shows that the LADY OF THE

ISLE is not a vessel in navigation under general maritime law.[1]

See Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560, 570 (5th Cir. 1995).

In Pavone, this Court held that the BILOXI BELLE, an "indefinitely moored, shore-side, floating casino[]" was not a "vessel" for purposes of the Jones Act or general maritime law. 52 F.3d at 570. This Court chose not to analyze the vessel status of floating casinos under traditional maritime

---

[1] Both parties submitted evidence to the magistrate judge on the issue whether the LADY OF THE ISLE was a vessel in navigation. The following are the undisputed facts: (1) the LADY OF THE ISLE is moored to land by lines tied to steel pilings; (2) the LADY OF THE ISLE has her own power source, but also receives from land additional shoreside lines, including water, telephone, electric, sewer, cable T.V., computer and data processing lines, which are connected indefinitely and semi-permanently to shore; (3) the LADY OF THE ISLE sits in an enclosed pond in a cofferdam, which was created with a weir gate system and then closed by use of fill and steel sheeting; (4) since her placement in the cofferdam, the LADY OF THE ISLE has never been used as a seagoing vessel to transport passengers, cargo, or equipment across navigable waters;(5) to unmoor her and move her into the Red River, the cofferdam would have to be dismantled, (including redredging access to the river and removing barricades, steel sheeting, and rock) requiring weeks of work, permits from the Army Corps of Engineers and other governmental agencies, and a cost of between $500,000 and $1,000,000; (6) the LADY OF THE ISLE is not required to sail; (7) the only transit the LADY OF THE ISLE has ever had was her initial delivery from the ship yard to her present location;(8) the LADY OF THE ISLE has a captain for each of three watches; (9) a log is kept; (10) there is a continuously manned pilot house on board with navigational equipment, engine controls, and navigational radar; (11) the LADY OF THE ISLE is powered by diesel engines, which are tested weekly to ensure that they are operational; (12) she is inspected by the Coast Guard every three months and is subject to unannounced inspections; (13) she has her own generators capable of generating electricity despite using shore-based utilities; (14) the Coast Guard requires that the LADY OF THE ISLE have on board a master, chief mate, a chief engineer, one oiler and eight seamen; however, the number of crewmen required has decreased since the LADY OF THE ISLE is not in transit and remains in the cofferdam; (15) the LADY OF THE ISLE is 251.6 feet long, 72 feet in breadth, and her hull is 14 feet deep.

methodology, choosing instead to apply the analysis used for vessels withdrawn from navigation and those used as work platforms, with a focus on the putative vessel's status at the time pertinent to the alleged injury. Id. at 568.

To determine the BILOXI BELLE's status, this Court used the following factors set forth in Bernard v. Binnings Construction Co., 741 F.2d 824, 831 (5th Cir. 1984), for analyzing work-platform cases: (1) was the structure involved constructed and used primarily as a work platform; (2) was the structure moored or otherwise secured at the time of the accident; and (3) although capable of, and at times engaging in, movement over navigable water, was the structure's function as a means of transportation merely incidental to its primary purpose of serving as a work platform. Id. at 568-69. This Court also recognized the later expansion of Bernard's first factor to encompass a structure that had not originally been constructed as work platform, "as long as it was primarily used as a work platform at the time of the accident and met the other factors." Id. at 569 (citing Ducrepont v. Baton Rouge Enterprises, Inc., 877 F.2d 393, 395 (5th Cir. 1989).

Applying these factors, this Court undertook the following analysis:

> Here, the semi-permanently or indefinitely moored barge supporting the BILOXI BELLE casino was constructed ab initio to be the floating site of a restaurant and bar (not a key factor given [] [the] recognition that original construction as a work platform is not a prerequisite). From its inception the instant barge was used first as a floating restaurant and bar until its conversion to a casino and its renaming as the BILOXI BELLE, after which it has been used only for casino purposes. Upon its arrival in Mississippi from

> Texas, the BILOXI BELLE was moored to the shore in a semi-permanent or indefinite manner, and continued to be thus moored before, during and after the accidents in question. The BILOXI BELLE is susceptible of being moved, and in fact was moved across navigable waters one time in the course of "normal operations" (assuming that movement to avoid the threat of a hurricane on a single occasion can be deemed "normal operations"), which one-time movement was purely incidental to the barge's primary purpose of physically supporting a dockside casino structure.

Id. at 570 (citation omitted). This Court therefore held that at the time of the alleged injuries, the BILOXI BELLE "(1) was removed from navigation, and (2) was a work platform" and was thus not a vessel for Jones Act purposes or general maritime law. Id. Defendants argue that Pavone is controlling.

Using Pavone's analysis, the LADY OF THE ISLE can be distinguished from the BILOXI BELLE because she does have operational engines, a captain, a crew, navigational aids, her own generators, and a continuously manned pilot house. Like the BILOXI BELLE, however, the LADY OF THE ISLE is semi-permanently moored to the shore by lines tied to steel pylons. The LADY OF THE ISLE also has numerous shore-side utility lines connected to her in a semi-permanent fashion. The parties present conflicting evidence regarding whether the LADY OF THE ISLE was built with the intention to cruise, however, as noted in Pavone, that factor is not necessarily dispositive. 52 F.3d at 569, 570. The LADY OF THE ISLE, moreover, had been relieved of the statutory duty to cruise since 1993; a duty previously imposed on other riverboat casinos in the state.[2]

---

[2] La. Rev. Stat. Ann. 27:65B(1)(b)(i)(West Supp. 2001) formerly read: "For the purposes of this Chapter, on or after September 15, 1993, in any parish which borders the Red River

Whatever its original purpose, the LADY OF THE ISLE has clearly been withdrawn from navigation. Since her arrival in Bossier City, the LADY OF THE ISLE has been semi-permanently moored to the shore including during the time of the accident. Although she was originally required to leave the cofferdam every five years for a hull inspection, that requirement has since been waived by the Coast Guard. Even had the Coast Guard not waived that requirement, this type of movement would be incidental to the LADY OF THE ISLE's primary purpose of serving as a casino. Should the LADY OF THE ISLE leave the cofferdam, such a move would require massive amounts of time and money. Under Pavone, the LADY OF THE ISLE is not a "vessel" under general maritime law.

Accordingly, we AFFIRM the judgment of the district court. Because we affirm the dismissal of plaintiffs' complaint for lack of subject-matter jurisdiction, we do not reach plaintiffs' request for additional discovery for purposes of summary judgment.

---

beginning five miles south of the Kansas City Southern Company/Louisiana Arkansas Crossing Railroad Bridge in Rapides Parish and ending five miles north of the Mid-South Company Railroad Bridge in Caddo Parish, gaming may be conducted while a riverboat is docked." On March 27, 2001, the statute was amended to read "gaming shall be conducted while a riverboat is docked and no cruises or excursions shall be conducted," and La. Rev. Stat. Ann. 27:66 was enacted to allow certain riverboat casinos in other parishes to remain docked. H.R. 2, 2001 Leg., 1st Extraordinary Sess. (La. 2001).