# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-CA-00458-SCT

*SHIRLEY ANN THOMPSON*

*v.*

*CASINO MAGIC CORPORATION, MARDI GRAS CASINO CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/22/96 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KENNETH R. WATKINS |
| ATTORNEYS FOR APPELLEES: | GEORGE F. BLOSS, III |
| | RICHARD WAYNE SLIMAN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 3/12/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/13/98 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Shirley Thompson, an employee of defendant Casino Magic, suffered injuries on two separate occasions while at work as a "change person." Shirley brought suit against Casino Magic Corporation alleging that the Dubuque Belle and the Casino Magic barge were unseaworthy under the Jones Act, 46 U.S.C. app. § 688 (1994), and general maritime law of the United States of America. On October 23, 1995, Casino Magic filed a motion for summary judgement which was granted on March 28, 1996. The trial court determined that Thompson was not a "seaman" and the Magic Casino barge was not a "vessel". Therefore the lower court found that Thompson was not entitled to Jones Act remedies. Thompson filed a notice of appeal to this Court on April 18, 1996. This Court finds that the lower court reached the right result because Thompson fails to attain seaman status.

¶2. Thompson began working for Casino Magic in Bay St. Louis as a "change person" on April 23, 1993. A change person makes change for casino patrons in the slot machine area. While counting the money that she was assigned while aboard the Dubuque Belle on May 17, 1993, Thompson suffered an injury when her vault or bank fell upon her. The day of the injury, Thompson, for the first time, had been assigned to the Dubuque Belle. Casino Magic admits that the Dubuque Belle is a "vessel"

for purposes of the Jones Act, but denies that the Casino Magic barge is a "vessel".

¶3. Several weeks after Thompson began working at Casino Magic, the Dubuque Belle arrived and moored adjacent to the Casino Magic barge to provide additional gaming and dining. The uncontradicted affidavits of Tina Frederiksen and Matthew Semski stated that the Dubuque Belle was not operated on a permanent basis but only used during the Summer of 1993 to handle overflow crowds. The affidavits noted that no change persons were permanently assigned to the Dubuque Belle, but rather, were assigned varying work locations prior to the beginning of every shift based on personnel availability, the number of patrons, and several other factors. Workers' activities and responsibilities remained the same regardless of the location assigned. Furthermore, workers were deliberately rotated off the Dubuque Belle since it attracted fewer patrons and was thereby less desirable to work.

¶4. After returning to work for two days, Thompson remained home for several months. Thompson returned to work on November 11, 1993, and resumed her regular duties as change person. The Dubuque Bell had sailed away by November 11th when she returned. On her first day back at work, Thompson fainted and fell to the floor of the Casino Magic barge, injuring her neck and back. Factual dispute exists as to whether this injury was caused by and related to the first injury. However, for summary judgement purposes, this Court will assume that the second injury was caused by and related to the first injury.

## LEGAL ANALYSIS

### I.

### WHETHER THE COURT HAD AUTHORITY TO GRANT SUMMARY JUDGEMENT ON WHETHER THOMPSON WAS "SEAMAN"?

¶5. Thompson contends that the circuit court improperly granted summary judgement because whether an employee is a "seaman" is an issue of fact for a jury to determine. Thompson is partially correct in her assertion. "However, seaman status may be decided on summary judgment where the evidence does not support a finding, as a matter of law, that the claimant is permanently assigned to a Jones Act vessel." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1995) (*quoting* *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 292 (5<sup>th</sup>Cir. 1990)). "And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 371 (1995) (citation omitted). The facts were undisputed here and the trial court properly granted summary judgment finding Thompson was not a seaman.

### II.

### WHETHER THE COURT PROPERLY DETERMINED THAT THE CASINO BARGE WAS NOT A "VESSEL" FOR PURPOSES OF THE JONES ACT?

¶6. Casino Magic concedes that the Dubuque Belle is a "vessel" for purposes of the Jones Act. It was on this "vessel" that Thompson incurred her first injury. For summary judgement purposes, this Court

will assume that the second injury was caused by and related to the first injury. Therefore, this case must be decided on the issue of Thompson's status of a "seaman" and not whether the Casino Magic barge is a "vessel". The lower court determined that the Casino Magic barge was not a "vessel" for purposes of the Jones Act, and therefore summary judgement was proper. This Court recently determined that shore side casinos constructed out of navigable barges were not vessels for purposes of federal maritime law. *King v. Grand Casinos of Mississippi, Inc.- Gulfport*, 697 So. 2d 439 (Miss. 1997). *King* defers to the Fifth Circuit federal court ruling that moored barges for gambling are not vessels under federal maritime law. *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995) *consolidated with* *Ketzel v. Mississippi Riverboat Amusement, Ltd.,* 867 F.Supp. 1260 (S.D.Miss. 1994).

¶7. *King* affirmed summary judgement in favor of the casino when employees injured on the job sought remedies under federal maritime law. Determining that shore side gambling casinos made on navigable barges were not "vessels" for purposes of federal maritime law, *King* deferred to *Pavone*'s analysis of common attributes for nonvessels:

> (1) The structure was constructed to be used primarily as a work platform;
>
> (2) the structure is moored or otherwise secured at the time of the accident; and
>
> (3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.

*Pavone*, 52 F.3d at 570 (citations omitted). Even considering these attributes, to say a casino barge is not a "vessel" under federal maritime law in all circumstances is overly broad and incorrect. These barges are capable of moving on navigable waters and several casino barges have been moved due to inclement weather as well as to relocate for business reasons. If an accident occurs during one of these moves and a worker is injured during that move, it is possible that the worker may classify as a "seaman" and his claim should not be barred because this Court has determined as a matter of law that the casino barge is not a "vessel". This would fly in the face of the very purpose of the Jones Act, namely to protect workers who do the ship's work and are regularly exposed to the perils of the sea. *Chandris*, 515 U.S. at 369. Even the Court in *Pavone* addressed this issue when it stated,

> We have nagging concerns nevertheless that vessel analyses of the kinds performed by the district courts in the instant cases could be overbroad, albeit through inadvertence, and thereby return to haunt us in slightly differing contexts in the future.[FN23] We conclude that the correct result reached by the district courts in these cases can be achieved in a narrower--and thus a jurisprudentially more principled--way, thereby avoiding the potentiality of undesirable future side effects.
>
> [FN23] For example, whether floating casinos, bars, restaurants, etc. would be Jones Act vessels for purposes of accidents occurring while they were being towed to a new location or to a shipyard or dry dock for work or repairs or to sheltered waters in avoidance of a hurricane. The approach we adopt *infra* also avoids the conflict in "vessel" status among the Jones Act, the general maritime law, state casino licensing classification, Coast Guard documentation, and "dictionary" definitions.

*Pavone*, 52 F.3d at 568.

¶8. Thompson also claims that public policy demands that the casino barge be defined as a "vessel" for maritime law in accordance with the Mississippi statutes which permit gambling. Miss. Code Ann. §§ 97-33-25 (1994) and 27-109-1 (1990). *King* addressed this specific point and found it to be without merit. *King* states:

> The term "vessel" has an entirely different meaning in the context of federal maritime law than in the context of the gaming licensing statutes of this State. Assuming that the Grand Casinos is in fact a "vessel" for the purposes of this State's gaming regulations, said fact is nevertheless utterly irrelevant to the issue of whether said casino constitutes a "vessel" for purposes of the federal maritime law. The definition of "vessel" in § 27-109-1 makes no reference whatsoever to the definition of "vessel" under either Jones Act legislation and/or under general maritime case law, nor, of course, do the applicable maritime cases on point make reference to the gaming statutes of this State in defining the term "vessel".

*King*, 697 So. 2d at 442-43. However, it should be made clear that in each case the trial court must consider the factual circumstances of each particular case in light of the concerns expressed in this opinion as well as by the Fifth Circuit's comments in *Pavone v. Mississippi Riverboat Amusement Corp.* as quoted *supra* when determining if a particular barge is a vessel for purposes of federal maritime jurisdiction. On the facts of this particular case, since Thompson is not a seaman, we need not determine whether the Casino Magic Barge is a vessel for maritime purposes.

### III.

**WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THOMPSON WAS NOT A "SEAMAN" FOR PURPOSES OF THE JONES ACT AND GENERAL MARITIME LAW?**

¶9. The Jones Act does not define "seaman." For years courts differed as to the appropriate test. However, recently, the United States Supreme Court in *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995), addressed the appropriate requirements for seaman status under the Jones Act, distinguishing between the "ship's crew" and those members of the maritime community whose employment is essentially land-based. After a rather lengthy historical discussion of the various approaches the courts have taken when determining seaman status, the U.S. Supreme Court stated that there were two essential requirements for seaman status:

> First, as we emphasized in *Wilander*, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.' " 498 U.S., at 355 (*quoting Robison*, 266 F.2d, at 779). The Jones Act's protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship's work. But this threshold requirement is very broad: "All who work at sea in the service of a ship" are eligible for seaman status. 498 U.S., at 354.

> Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature. The fundamental purpose of this substantial connection requirement is

to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea. See 1B A. Jenner, Benedict on Admiralty, § 11a, pp. 2-10.1 to 2-11 (7th ed. 1994) ("If it can be shown that the employee performed a significant part of his work on board the vessel on which he was injured, with at least some degree of regularity and continuity, the test for seaman status will be satisfied" (footnote omitted)). This requirement therefore determines which maritime employees in *Wilander* 's broad category of persons eligible for seaman status because they are "doing the ship's work," 498 U.S., at 355, are in fact entitled to the benefits conferred upon seamen by the Jones Act because they have the requisite employment-related connection to a vessel in navigation.

*Chandris*, 515 U.S. at 368-369. The U.S. Supreme Court went on to say that the lower courts' various approaches to determining seaman status make the same point:

> ...The Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to "the special hazards and disadvantages to which they who go down to sea in ships are subjected." *Sieracki*, 328 U.S., at 104, 66 S.Ct., at 882 (Stone, C.J., dissenting). . . . In our view, "the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon." *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 432 (CA5 1984). The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time.

*Chandris*, 515 U.S. at 370. The U.S. Supreme Court concluded that a seaman must have a substantial connection with a vessel in navigation both in duration and nature. *Id.*

¶10. The Court went on at length to explain seaman status was not a transitory state which changed each day or hour, oscillating between Jones Act coverage and other remedies. *Id.* at 372. A seaman injured on the land does not lose seaman status, just as a land-based employee is not a seaman and member of the crew simply because he is injured on the vessel in navigation. Thus, the site of injury is not the determinative factor. The status of the individual as a seaman is based on his/her substantial status as a member of the crew, and the substantial relationship to the vessel and its navigation in the water. *Id.* at 360-361. Simply put, "a maritime worker does not become a 'member of a crew' as soon as a vessel leaves the dock." *Id.* at 361.

¶11. In the case *sub judice*, the trial court correctly determined that Thompson did not meet the criteria of *Chandris* and concluded that she was not a "seaman." The uncontradicted affidavits of Tina Frederiksen and Matthew Semski establish that the duties of a change person remained the same regardless of the particular work assignment being the casino proper or the Dubuque Belle. Thompson had a very temporal relationship with the Dubuque Belle because she worked on the vessel only one day. However, had the injury not occurred on her first day on the Dubuque Belle, she still would not have been considered part of the ship's crew. Thompson did not have a substantial

relationship with the nature of the Dubuque Belle's navigation nor did she expose herself to the perils of sea because she never worked on the vessel while out at sea, but only while docked. Simply put, Thompson was a land-based worker who happened to receive injury while aboard a vessel.

¶12. Thompson was not a seaman for two distinct reasons. First, Thompson's relationship to a ship in navigation (the Dubuque Belle) was so temporal that she was not a seaman. The substantial connection requirement is used to distinguish land-based and sea-based employment. *Harbor Tug and Barge Co. v. Papai*, 117 S.Ct. 1535 (1997). The basis of a determination of seaman status is the "employee's connection to a vessel in navigation." *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 354 (1991). The same analysis is appropriate in the case *sub judice*. Thompson had no duties while the boat was in motion, she slept at home, boarded off ship and was an hourly wage earner. Therefore, Thompson was more like a casual worker on the water, not a seaman. Second, she was not a seaman because she fails to classify as part of the crew with regard to the navigation and operation of the Dubuque Belle at sea. Clearly, if the Dubuque Belle left the dock and sailed around the Gulf of Mexico and Thompson was on board as a change person, she would probably be considered a seaman. However, the Dubuque Belle remained moored when operating as an overflow casino. The crew of the Dubuque Belle presumably stayed aboard to assure that various equipment worked properly when the ship would again sail. These crew members retain seaman status. However, Thompson did not participate in the ship's actual sailing in the sea. The Jones Act was passed to provide further protection for persons who subjected themselves to the perils of the sea. Clearly, Thompson, who never was at sea on the Dubuque Belle nor subjected herself to the perils of the sea, can not be classified as a seaman.

## IV.

### WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY NOT ADDRESSING THE DOCTRINE OF UNSEAWORTHINESS IN MARITIME LAW?

¶13. Thompson contends that the trial court's grant of summary judgement failed to address her maritime claim of unseaworthiness. However, the trial court implicitly addressed Thompson's unseaworthiness claim by determining that Thompson was not a seaman. Unseaworthiness claims are predicated on a determination that the claimant was a seaman. Therefore, this Court concludes that this contention is without merit.

### CONCLUSION

¶14. The trial court properly granted summary judgement in favor of Casino Magic because Thompson is not a "seaman". Even considering the facts in the most favorable light to Thompson's claims, including the factual premise that all of her injuries resulted from the initial injury while assigned to the Dubuque Belle (and there is a factual dispute on this point), Thompson fails to attain seaman status. Even if Thompson's injuries occurred on the Dubuque Belle the last day the Dubuque Belle operated at the Grand Casino, Thompson's relationship to the navigation of the Dubuque Belle was temporal and unsubstantial in nature. Therefore, the trial court properly granted summary judgement in favor Casino Magic based on this determination alone. Accordingly, the judgment below is affirmed.

¶15. **AFFIRMED.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**