In the Matter of TREASURE BAY CORP., Miller Gaming, Inc. and Miller Management, Inc., Debtors.

ROY ANDERSON CORP., Plaintiff,

v.

TREASURE BAY GAMING & RESORTS, INC., et al., Defendants.

ROY ANDERSON CORP., Plaintiff,

v.

TREASURE BAY CORP., et al., Defendants.

ROY ANDERSON CORP., Plaintiff,

v.

TREASURE BAY CORP., et al., Defendants.

Bankruptcy No. 94–09048 SEG.

Adversary Nos. 95–0816 SEG, 95–0866 and 95–0925.

United States Bankruptcy Court, S.D. Mississippi, Biloxi Division.

Jan. 29, 1997.

William H. Leech, Samuel C. Kelly, William R. Purdy, Jackson, MS, for Roy Anderson Corp.

Troy D. Phillips, Ruth A. Wagoner, Dallas, TX, Robert A. Byrd, Biloxi, MS, for Treasure Bay Corp. and Treasure Bay Gaming & Resorts, Inc.

Henry Chatham, James Robertson, Richard Montague, Jackson, MS, Michael B. Fisco, Mark G. Rabogliatti, Minneapolis, MN, for First Trust National Association.

Harris Quinn, John Branson, Memphis, TN, Steve Rosenblatt, Jackson, MS, for TN Bank Nat'l. Assoc. As Trustee for James Neely Grant.

## MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

The motion of Roy Anderson Corporation ("Anderson") for summary judgment (Pl. 3) and the objection and cross-motion for summary judgment of First Trust National Association ("First Trust"), as indenture trustee (Pl. 41), raises the question of whether two dockside gambling casinos are "vessels" for purposes of the Ship Mortgage Act, 46 U.S.C. § 31301 et seq.

For the following reasons, the court holds that they are not.[1]

### I. Factual Background

The parties are not in disagreement as to the basic, relevant facts concerning the two gambling casinos owned and operated by Treasure Bay Corp.[2] The two casinos—one located at One Treasure Bay Drive, Robinsonville, Tunica County, Mississippi ("Treasure Bay Tunica") and the other at 1938 Beach Boulevard, Biloxi, Harrison County, Mississippi ("Treasure Bay Biloxi") have certain common features.

1. Both are permanently moored through extensive connections to land-based structures and utilities. Affidavit of David W. Hill ("Hill aff."), p. 3; Affidavit of Luis F. Galnares, Jr. ("Galnares aff."), pp. 2, 3.

2. Neither has means of self-propulsion, a rudder, an anchor, or a steering mechanism. (Hill aff., p. 4; Galnares aff., pp. 3–4).

3. Neither has self-contained power, water, fire protection, sewerage, or a life-safety or rescue system. (Hill aff., p. 4; Galnares aff., p. 3).

4. Neither has navigational equipment or navigational lights. (Hill aff., p. 4; Galnares aff., p. 3).

5. Neither has life rafts, life vests, or any of the other usual marine saving equipment. (Hill aff., p. 4; Galnares aff., pp. 3–4).

6. Neither has a captain or a crew. (Hill aff., p. 4; Galnares aff., p. 4).

7. The electrical, mechanical, water, fire protection, and sewerage systems for both casinos were designed by engineers in accordance with the Southern Building Code and other commercial/industrial building codes, not in accordance with the U.S. Coast Guard and American Bureau of Shipping ("ABS") requirements. (Hill aff., p. 4; Galnares aff., p. 3).

The following additional facts as to the two gambling casinos are gleaned from the affidavits of two of the men on the job during construction: (1) Hill, assistant project manager, Treasure Bay Tunica, and (2) Galnares, project engineer, Treasure Bay Biloxi.

### A. Treasure Bay Tunica

To construct this casino facility, a large canal was dug approximately 3,000 feet from the Mississippi River to the permanent site of the casino. The area between the river and the beginning of the man-made canal is 300–400 yards of wetlands. For the majority of the year, these wetlands are covered by only a couple of feet of water. Once the canal was completed it was flooded to allow passage of the four barges hereinafter described to the permanent location. After the barges were floated down the canal, three man-made dams were constructed along the canal.

Each of the four barges making up the casino structure was approximately 229 feet long and 57 feet wide. After they were floated separately down the man-made canal, they were arranged in a rectangular configu-

---

1. This memorandum opinion constitutes the court's findings of facts and conclusions of law in accordance with Bankruptcy Rule 7052. The court has jurisdiction over this matter under 28 U.S.C. § 1334. The matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2. The two debtor-defendants—Treasure Bay Gaming & Resorts, Inc., the parent corporation, and Treasure Bay Corporation, the subsidiary operating the two casinos, are usually referred to herein as the debtors or debtor corporations. When necessary to distinguish them, they are referred to as the "parent corporation" and the "subsidiary".

ration with two barges side-by-side and the other two barges in line behind them to form a rectangle approximately 458 feet long and 114 feet wide. The barges were aligned in this formation in the basin by August 1993.

The barges were then interconnected by welding steel members and steel plates along the entire length of each barge both at the top and the bottom, thus connecting the four barges and forming a single watertight structure. Then a concrete slab was poured over the entire deck to provide a level surface. The concrete slab was completed by mid-October 1993. Shortly thereafter, Anderson began the erection of structural steel on one end of the structure.

Treasure Bay Tunica has only three levels, but each of these is higher than a traditional story of a building. The casino rises approximately 80 feet above the deck of the barges, including a 40 foot roof parapet extending above the third floor. The total height is equivalent to an eight story building. In addition, the casino has three mast poles with the center mast extending approximately 400 feet from the deck of the barges.

Treasure Bay Tunica is connected to permanent mooring at two locations. The moorings are concrete and steel. The connections are embedded in concrete to the moorings and the mooring steel would have to be cut to allow the casino to be disconnected. There are also six ramps permanently attached to the casino that serve as entrance ways and stairs, and there is no means to raise or lower such ramps from their permanent location. The entrance ways and stairs are all connected to the land outside the boat basin. If the casino were to be moved,[3] these entrance ways and stair towers would have to be cut or disconnected and there would be no means of egress for people on the casino.

Treasure Bay Tunica was situated in a basin approximately 350 feet by 600 feet. The basin was comprised on the north and east side of steel sheet pilings driven to a depth of 40 feet. Beyond the sheet piling was an asphalt paved parking lot. The west side was enclosed by an earthen dam which is reinforced by vertical steel piling. The south side was boarded by an asphalt paved parking lot.

## B. Treasure Bay Biloxi

Treasure Bay Biloxi was constructed on a single barge measuring 300 feet by 90 feet. The barge has an additional 30 foot pud on the front end to allow construction of the bow shape. Once the barge was provided to Anderson by the owner, a concrete slab was poured over the entire deck to provide a level surface to build upon. This work was completed by October 1993. When the concrete slab was poured, Anderson immediately began the erection of structural steel.

The Biloxi casino has only three levels, but each of these is much higher than a traditional story of a building. The casino rises approximately 45 feet above the deck of the barge. The height is equivalent to a four story building. The casino has three mast poles with a center mast extending approximately 210 feet above the deck of the barge. The casino structure itself is structural steel and concrete slab. The structure was designed by Richardson Engineering in accordance with standard commercial/industrial building codes and not pursuant to the regulation of the U.S. Coast Guard or the ABS.

The Biloxi casino is connected to permanent moorings at six locations. The moorings are constructed out of steel casings filled with concrete. The connections are welded to the moorings, and the mooring steel would have to be cut to allow the casino to be disconnected.

The Biloxi operation has a land-based facility referred to as the fort. The fort is a three story building with an adjacent parking lot for customers. The first floor contains maintenance offices, a souvenir shop, a loading dock, and storage areas. The second

---

3. These relevant facts are taken from the Hill affidavit sworn to on February 23, 1995. Exhibit 1 to P–3. The affidavit of Bernie Burkholder, president and chief executive officer of the operating subsidiary, sworn to on January 7, 1997 discloses that the Treasure Bay Tunica was closed, moved from its moored site and sold in November 1995. This change of circumstances after the filing date is not considered as a material fact in determining whether Treasure Bay Tunica was a vessel at the time the preferred maritime mortgage was executed.

floor contains a buffet restaurant, kitchens, employee dining, and mechanical/electrical rooms. The third floor contains the executive offices and space for an additional restaurant in the future.

The fort supports the casino by:

1. Four ramps attach the fort to the barge.

2. The fort is a central area for all utilities to the barge. The second floor ramp is used as the main access to the barge.

3. The fort contains two backup generators for the barge.

Overall, the fort is the life-support for the barge. If the fort facilities were to fail or the barge were disconnected to the fort, the casino barge would essentially be rendered inoperative. Only minor systems would still work. Power would be available to evacuate customers and keep security systems going, but casino operations would have to cease.

All of the permanent electrical, mechanical, water, fire protection, and sewerage systems are not on the barge, itself, but instead are located outside the boat basin in land-based facilities. These systems were also designed by the engineers in accordance with the Southern Building Code and other commercial/industrial building codes, not in accordance with the U.S. Coast Guard and ABS requirements.

There is extensive electrical wiring, water, and sewerage piping, and fire protection (sprinkler) piping which connects the land-based systems to the barge. If anyone ever tried to move the barge, all of these systems would have to be disconnected or cut.

The barge, itself, has no means of propulsion. It has no rudder, no anchor, and no steering mechanism. It has no navigational lights and is not equipped with radar, fathometers, lorans, or any other navigational equipment. It has no life rafts, no life vests, or any other marine life safety equipment. The barge does not have a captain or a crew aboard.

The factual statements in the Hill and Galnares affidavits as to the construction, location and navigability of the two casinos in 1993–1994 are not controverted by First Trust.

C. *First Trust*

First Trust is the indenture trustee under an indenture between the parent corporation and First Trust dated as of November 17, 1993, pursuant to which the parent corporation issued its 12¼ percent first mortgage notes due November 15, 2000 in the principal face amount of $115,000,000 ("notes"). (Affidavit of Scott Strodthoff ("Strodthoff aff."), Ex. A). The parent corporation lent the loan proceeds of the notes to the subsidiary in exchange for the subsidiary's 12¼ percent first mortgage note due 2000 in the principal amount of $115,000,000 ("Treasure Bay note").

The Treasure Bay note is secured by, among other things, first preferred ship mortgages on the Treasure Bay Tunica and the Treasure Bay Biloxi. The Treasure Bay note is further secured by a security interest in and/or a mortgage on substantially all of the subsidiary's other assets.

Pursuant to the terms of an assignment agreement between the parent and First Trust, the parent assigned its rights with respect to the Treasure Bay note, its first preferred ship mortgages and other security agreements and mortgages, to First Trust. (Strodthoff aff., Ex. B).

The first preferred ship mortgage in favor of the parent identifying the Treasure Bay Tunica was filed with the Eighth Coast Guard District, Port of New Orleans, Louisiana, on November 17, 1993 at 12:31 p.m. and recorded in Book No. PM–246, Instrument 314. (Strodthoff aff., Ex. C).

The first preferred ship mortgage in favor of the parent identifying the Treasure Bay Biloxi was filed with the Eighth Coast Guard District, Port of New Orleans, Louisiana on November 17, 1993 at 12:31 p.m. and recorded in Book No. PM–246, Instrument 315. (Strodthoff aff., Ex. D).

The assignment of first preferred ship mortgage in favor of First Trust identifying the Treasure Bay Tunica and the Treasure Bay Biloxi was filed with the Eighth Coast Guard District, Port of New Orleans, Louisi-

ana, on November 17, 1993, at 12:32 p.m. and recorded in Book PM–246, Instrument 316. (Strodthoff aff., Ex. E).

On November 17, 1993, the U.S. Coast Guard issued certificates of documentations for the Treasure Bay Biloxi and the Treasure Bay Tunica. The certificate of documentation for the Treasure Bay Biloxi carries a coastwide endorsement. The certificate of documentation for the Treasure Bay Tunica carries a registry endorsement. (Strodthoff aff., Ex. F and G)

## II. *Procedural Background*

On November 18, 1994 certain creditors of the subsidiary filed involuntary Chapter 7 petitions with the United States Bankruptcy Court for the Southern District of Mississippi. On January 10, 1995, the subsidiary voluntarily converted to Chapter 11 and the parent corporation filed a voluntary petition for relief under Chapter 11. The Chapter 11 cases were ordered jointly administered by order of January 10, 1995.

On January 30, 1995, Anderson filed Adversary No. 95–0816SEG naming several defendants, including the debtors and First Trust. The complaint sought, among other things, a declaratory judgment that Treasure Bay Tunica and Treasure Bay Biloxi were not "vessels" and that First Trust did not have first preferred ship mortgages pursuant to the Ship Mortgage Act. Anderson filed the pending motion for partial summary judgment on February 27, 1995. On March 28, 1995, First Trust filed its objection and cross-motion for summary judgment. (Pl. 41). The debtor corporations filed a response on April 3, 1995 stating that they took no position regarding the lien dispute between Anderson and First Trust. (Pl. 45).

Three adversary proceedings filed in the debtors' cases were consolidated into Adversary Proceeding No. 95–0816 by order of September 22, 1995.

By order of transferral dated November 5, 1996, the Chapter 11 cases and adversary proceedings were transferred to the undersigned Bankruptcy Judge for the Eastern District of Louisiana, sitting in the Southern District of Mississippi by designation of the Court of Appeals for the Fifth Circuit dated September 25, 1996.

On January 7, 1997, First Tennessee Bank National Association ("First Tennessee") filed a response to the summary judgment motions of Anderson and First Trust in which First Tennessee agrees with Anderson's position that the two casinos were not "vessels" and seeks other relief not yet heard by the court. (Pl. 117).

Additional memoranda have been filed. The motions were argued and taken under advisement on January 10, 1997.

### III. *Analysis*

A. *Statutory Definition of Vessel Under Federal Maritime Laws*

Title 1 of the United States Code, providing rules of construction for the United States Code, defines "vessel" as:

> The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

1 U.S.C. § 3.

The definition section of the Ship Mortgage Act defines "vessel" as follows:

> 'vessel' has the same meaning given that term in section 3 of title 1 [1 USC § 3].

46 U.S.C. § 2101(45).

Chapter 313 of Title 46, entitled "Commercial Instruments and Maritime Liens", defines "preferred mortgage" as a "mortgage that is a preferred mortgage under section 31322 of this title." 46 U.S.C. § 31301(6). Section 31322 in turn provides that "A preferred mortgage is a mortgage, whenever made, that—(A) includes the whole of a vessel; (B) is filed in substantial compliance with Section 31321 of this title; and (C)(i) covers a documented vessel". 46 U.S.C. § 31322(a)(1).

It is clear that First Trust can only have preferred mortgages if each of the casinos in question qualifies as a "vessel". This requires a review of the jurisprudence to determine what constitutes a "vessel".

B. *Cases interpreting "vessel"*

The fairly recent Fifth Circuit case of *Pavone v. Mississippi Riverboat Amusement*

*Corp.*, 52 F.3d 560 (5th Cir.1995) is the proper starting point. The *Pavone* opinion dealt with two consolidated cases on appeal, one from the Eastern District of Louisiana and the other from the Southern District of Mississippi. Appellant Pavone, who sought recovery under the Jones Act, 46 U.S.C.App. § 688 (1988), was employed as a bartender on the BILOXI BELLE, a floating dockside casino moored in Biloxi, Mississippi. The district court in Louisiana held that the BILOXI BELLE was not a Jones Act vessel.

Appellant Ketzel alleged that she was injured while working as a cocktail waitress on the BILOXI BELLE and filed suit in the Southern District of Mississippi for recovery under the Jones Act and the general maritime law. The district court in Mississippi granted the defendants' motion for summary judgment, and held that Ketzel was not a seaman when she was injured because the BILOXI BELLE was "nothing but a 'floating casino' ... not a 'vessel' under the Jones Act." *Pavone*, 52 F.3d at 563.

The Fifth Circuit in *Pavone* fully described the BILOXI BELLE. *Pavone*, 52 F.3d at 564. Its characteristics are strikingly similar to those of Treasure Bay Tunica and Treasure Bay Biloxi.

The Fifth Circuit defined the core question as whether the BILOXI BELLE was a Jones Act vessel at the time in question and agreed with the two district court judges' granting of summary judgment. The *Pavone* opinion, however, expressed a concern that the vessel analysis as performed by the district courts could be overbroad and return to haunt the courts in the future. *Pavone*, 52 F.3d at 568. Therefore, the *Pavone* court confined its analysis of putative "vessels" to those that were either withdrawn from navigation or never placed in navigation. *Id.* After a full review of the cases involving vessels "withdrawn from navigation" and concerning "work platforms", the Fifth Circuit concluded that under either line of cases BILOXI BELLE was not a vessel for purposes of the Jones Act or the general maritime law.

First Trust seeks to distinguish the *Pavone* opinion on the basis that it did not define a "vessel" for the specific purposes of the Ship Mortgage Act. This court is unable to draw the fine line of demarcation that First Trust insists distinguish a "vessel" for purposes of the Ship Mortgage Act from a "vessel" for all other purposes.

It is clear that the Fifth Circuit was setting forth a test for Jones Act cases, general maritime law, and other purposes. This is made clear from footnote 23 which states, in part:

> The approach we adopt *infra* also avoids the conflict in "vessel" status among the Jones Act, the general maritime law, state casino licensing classification, Coast Guard documentation, and "dictionary" definitions.

*Pavone*, 52 F.3d at 568 n. 23.

■ There is no language anywhere in the *Pavone* opinion permitting this court to coin a different definition of "vessel" for purposes of the Ship Mortgage Act. *Pavone* specifically set forth the proper analytical approach for defining a vessel for general maritime law purposes. *Pavone*, 52 F.3d at 570. The Ship Mortgage Act adopts the definition of "vessel" from the general maritime law. *See supra* at 10.

■ The application of the "work platform" analysis from *Pavone*, 52 F.3d at 569–570 shows that the two casinos here involved are not vessels.[4] Quoting from the prior Fifth Circuit case of *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290 (5th Cir.1990), the *Pavone* opinion stated:

> A survey of the case law demonstrates three common attributes for nonvessels:
>
> (1) The structure was constructed to be used primarily as a work platform;
>
> (2) the structure is moored or otherwise secured at the time of the accident; and
>
> (3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course

---

**4.** There is no point in making the "withdrawn from navigation" analysis that is discussed in the *Pavone* opinion because the two casinos in question were never in navigation since their construction as casinos at their permanent locations.

of normal operations, any transportation function is merely incidental to the platform's primary purpose.

*Pavone,* 52 F.3d at 570, *quoting, Gremillion,* 904 F.2d at 293–94.

Application of these three attributes to the casinos in question clearly demonstrates that they have all three common attributes of nonvessels: (1) neither structure was constructed to be used primarily as anything other than a gambling casino; (2) both structures were moored or otherwise secured at all relevant times at their permanent locations; and (3) they were not capable of movement and never moved across navigable waters in the course of normal operations. There was no transportation function that could be incidental to the primary purpose of the two structures—the operation of gambling casinos.

First Trust's argument that *Pavone* should be distinguished because it specifically dealt with the definition of a vessel for purposes of the Jones Act is bottomed on the proposition that the definition of "vessel" for purposes of the Ship Mortgage Act may be different than "vessel" as defined in general maritime law, which First Trust argues was recognized in the Supreme Court case of *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995).

The court finds nothing in the *Grubart* opinion that detracts from the analysis of the Fifth Circuit in *Pavone.* It was not even seriously contested that the barge in question in *Grubart* was a vessel for admiralty tort purposes. The facts show that, even though it was temporarily attached to the bed of a river by spudding at the time the damage was done, it was at all times used for transportation. The *Grubart* case does not help First Trust because the casinos here involved were never used for transportation and were not capable of being used for transportation.

Other cases, both before and after *Pavone,* hold that gambling casinos similar to those here involved are not vessels. One of these cases squarely decided the narrow issue that First Trust argues was not covered by the Fifth Circuit in *Pavone,* i.e., the gambling casino was not a "vessel" for purposes of the Ship Mortgage Act. On January 10, 1995, in the case of *Charles N. White Construction Co. v. MRA, Ltd. (In re Biloxi Casino Belle Inc.),* 176 B.R. 427 (Bankr.S.D.Miss.1995), Judge Edward R. Gaines, the same bankruptcy judge to whom these cases were first assigned, held that the Southern Belle Casino and Biloxi Belle II Casino were not "vessels" for purposes of federal admiralty and maritime matters and the Ship Mortgage Act. Judge Gaines held:

> The Biloxi Belle II Casino and the Southern Belle Casino certainly float on water. However, for the reasons stated above in the Court's Findings of Fact, the Biloxi Belle II Casino and the Southern Belle Casino were not designed or intended nor are they realistically capable of being used as a *means of transportation* on water in the business of maritime commerce. Instead, the Biloxi Belle II Casino and the Southern Belle Casino were designed and intended to be used exclusively as permanently moored, dockside gaming casinos pursuant to the Mississippi Gaming Control Act, *Miss.Code Ann.,* § 72–76–1 *et seq.* Therefore, the Biloxi Belle II Casino and the Southern Belle Casino do not constitute "vessels" for purposes of federal admiralty and maritime matters and the Ship Mortgage Act, 46 U.S.C. § 30301 *et seq.* [emphasis in original].

*Charles N. White Construction Co.,* 176 B.R. at 433.

The description of Southern Belle Casino and Biloxi Belle II Casino shows that these two casinos are almost identical to Treasure Bay Tunica and Treasure Bay Biloxi. First Trust cannot distinguish the facts of *Charles N. White Construction Co.* so it simply argues that the case is wrong. That argument is insufficient. This court agrees with the reasoning of Judge Gaines in *Charles N. White Construction Co.* His decision is strengthened by the Fifth Circuit decision in *Pavone.*

In *King v. President Riverboat Casino–Mississippi, Inc.,* 894 F.Supp. 1008 (S.D.Miss.1995), King sought damages under general maritime law for injuries he suffered

as a "passenger" on the President Riverboat Casino. Holding that this floating casino was not a "vessel" and the activity associated with the alleged injury lacked a sufficient nexus to traditional maritime activity, District Judge Gex dismissed the complaint for lack of jurisdiction. The Fifth Circuit referred to the *King* opinion, seemingly with approval, in *Pavone* because Judge Gex had held BILOXI BELLE was not a vessel in the *Ketzel* case. *Pavone*, 52 F.3d at 563 n. 2.

A case subsequent to *Pavone* had no difficulty in applying the *Pavone* analysis to find that a gambling casino similar to Treasure Bay Tunica and Treasure Bay Biloxi was not a "vessel". *McAdow v. Promus Companies, Inc.*, 926 F.Supp. 93 (W.D.La.1996), involved an alleged seaman seeking damages under the Jones Act for injuries that occurred while he was working on the M/V Shreveport Rose, the home of Harrah's Shreveport casino. District Judge Stagg held that the Shreveport Rose was both removed from navigation and a work platform before, during and after the alleged injury. The decision pointed out that the structure was, for all intents and purposes, a land-based casino and described the permanent connection between the Shreveport Rose and the shore. The decision concluded that the vessel was never used nor intended to be used for transporting freight or passengers and was therefore not a vessel for Jones Act purposes.

### IV. *Conclusion*

The Ship Mortgage Act defines "vessel" by adopting the definition in the general maritime law. The Fifth Circuit in *Pavone* has set forth the type of analysis that should be applied to determine whether a dockside gambling casino is a "vessel" for general maritime law and for other purposes. Applying that analysis to Treasure Bay Tunica and Treasure Bay Biloxi convinces the court that the two casinos are not "vessels" for purposes of the Ship Mortgage Act. Therefore, First Trust does not have preferred marine mortgages against the two casinos.

Judgment will be entered granting Anderson's motion for summary judgment and denying the cross-motion of First Trust for summary judgment.

### *JUDGMENT*

For the reasons assigned in the foregoing memorandum opinion issued this date, accordingly,

**IT IS ORDERED, ADJUDGED, AND DECREED** that the motion for summary judgment filed by Roy Anderson Corporation on February 27, 1995 is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the cross-motion for summary judgment filed by First Trust National Association on March 28, 1995 is **DENIED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Treasure Bay Tunica and the Treasure Bay Biloxi are not vessels for purposes of the Ship Mortgage Act, and that First Trust National Association does not have a preferred marine mortgage on the Treasure Bay Tunica or the Treasure Bay Biloxi.