709 So.2d 904 (1998)
Robert Lee CHASE, Plaintiff-Respondent,
v.
LOUISIANA RIVERBOAT GAMING, PARTNERSHIP, dba Isle of Capri Casino, et al., Defendant-Applicant.
No. 30368-CW.
Court of Appeal of Louisiana, Second Circuit.
February 25, 1998.
*905 John Steven Hunter, New Orleans, Charles W. Salley, Shreveport, Donald James Volpi, Jr., New Orleans, for Defendant-Applicant.
John Taylor Bennett, Marksville, Richard B. King, Jr., Shreveport, for Plaintiff-Respondent.
Before NORRIS, HIGHTOWER, BROWN, WILLIAMS and PEATROSS, JJ.
*906 NORRIS, Judge.
Pursuant to the "savings to suitors" clause contained in 28 U.S.C. § 1333, plaintiff, Robert Lee Chase, filed suit in Louisiana state court against defendants Louisiana Riverboat Gaming Partnership d/b/a Isle of Capri Casino, et al.[1] ("Isle of Capri") seeking recovery under the Jones Act[2] and under general maritime law for an alleged injury incurred while serving as Chief Engineer aboard the casino riverboat, Lady of the Isle. The case presents the res nova issue to this court of whether a casino riverboat, specifically the Lady of the Isle, is a "vessel" for Jones Act purposes.[3] For the following reasons, we make our writ peremptory and render summary judgment declaring that the Lady of the Isle was not a "vessel" under the Jones Act or under general maritime law at the time of the accident.

I.
The Lady of the Isle was constructed in Morgan City, Louisiana, and under its own power, sailed up the Red River to reach its present location in Bossier City. Upon its arrival, it moved into a containment "pond"[4] adjacent and accessible to the Red River. Afterwards, a steel wall or "weir gate" was set in place, and reinforced by 4 steel buttresses and 25 tons of rock, which sealed off the pond from the Red River and thus, the boat would not be subject to the rise and fall of the tides. Eventually, a natural levee, approximately 12 feet high, was formed on the river side of the weir gate, thus further insulating the boat from the river. The Lady of the Isle has not left the pond since its arrival in May of 1994.
Steel cables secure the casino to concrete-filled moorings. An entrance ramp attached to the casino on one end and to a land based edifice on the other provides additional mooring. Finally, the casino is connected to land by utility lines supplying water, telephones, electricity, sewer, cable T.V., and computer and data processing lines. The casino can be unmoored and moved into the Red River; however, the Isle of Capri's vice president and professional engineer described the process:
[F]irst, it would be necessary to disconnect the [Lady of the Isle] from all its land based utility sources and to disconnect its steel cable mooring lines from the cement pilings inside the slip. Second, it would be necessary to obtain a dredging permit from the [U.S.] Army Corps of Engineers, as well as permits to allow dumping of 25 tons of rock (and of the accumulated silt and dirt levee constructed by the Red River.) Third, diving teams would be required to disconnect steel pins holding the four steel buttresses which support the steel wall, and to remove the rubber liner inside of the wall. Finally, a crane barge of at least 100 ton capacity would be required in order to lift the steel wall and the four steel buttresses out of the water. Such a procedure would require approximately two to three months and cost between $500,000.00 and $1 million.[5]
(Schultz depo. p.3.)
Nevertheless, the casino contains navigational equipment and radar, bilge pumps, a propulsion system, ballasts tanks, lifeboats, independent utilities, and fire detection and *907 PA systems. It is licensed and inspected by the Coast Guard every three months and subject to unannounced inspections. The Lady of the Isle's complement, excluding gaming personnel, consists of a master (captain), a chief mate, an oiler, a chief engineer and eight crewmembers. The captain or chief mate is present on the bridge at all times, and the engines are tested weekly.

II.
To recover from an employer under the Jones Act or under general maritime law, a plaintiff must be a "seaman." Harbor Tug and Barge Co. v. Papai, 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997); Hebert v. Air Logistics Inc., 720 F.2d 853 (5th Cir. 1983). To acquire seaman status, a plaintiff must prove, among other requirements, a connection to a vessel in navigation. Papai, supra. Therefore, the Lady of the Isle's classification as a Jones Act vessel is determinative of whether Chase will be considered a seaman, thereby entitling him to the more alluring remedies afforded under federal law than the indemnity benefits provided by the Louisiana's Worker's Compensation Act. See Thibodaux v. Atlantic Richfield Co., 580 F.2d 841 (5th Cir.1978), cert. denied 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274, citing Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).
The Isle of Capri moved for summary judgment declaring that the Lady of the Isle was not a vessel in navigation for purposes under the Jones Act or general maritime law. The district court denied summary judgment citing the boat's physical characteristics, the fact that it must qualify as a "riverboat" to engage in gaming operations under the laws of this state, and equity. The Isle of Capri sought a supervisory writ[6] raising one assignment of error: Because there exists no genuine issue of material fact, the trial court erred in failing to grant defendant's motion for summary judgment seeking dismissal of plaintiff's claims under the Jones Act and under general maritime law on the grounds that the Lady of the Isle does not qualify as a Jones Act vessel. We granted a writ on August 14, 1997.

III.
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Berzas v. OXY USA, Inc., 29,835 (La. App. 2d Cir. 9/24/97), 699 So.2d 1149; Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730. Summary judgments are governed by La. C.C.P. art. 966 which was amended both in the 1996 and 1997 legislative sessions. See, Acts 1996, No. 9 First Ex. Session, § 1 ("Act 9"), and Acts 1997, No. 483 § 1 ("Act 483"). Both amendments to article 966 are procedural and have retroactive effect. Anderson v. Allstate Ins. Co., 29, 847 (La.App. 2d Cir. 9/24/97), 699 So.2d 1160. Act 9 changed the law to relieve a movant from having to negate an essential element(s) of the non-movant's claim on which the non-movant will bear the burden of proof at trial; instead the movant need only point out to the court an absence of factual support for one or more of the non-movant's essential elements. Hayes v. Autin, 96,287 (La.App. 3d Cir. 12/26/96), 685 So.2d 691; see also Stephen A. Pitre, Comment, The Pelican State Amends Summary Judgment: Recent Louisiana Jurisprudence Uncertain About Legislative Intent, 43 Loy. L.Rev. 97, 116 (1997). Thereafter, the failure of the non-movant to produce factual support sufficient to show that he will be able to meet his burden of proof at trial results in a finding that there is no genuine issue of material fact. Hayes, supra. Act 483 amended article 966 to merely clarify the changes Act 9 *908 made and to overrule all cases inconsistent with Hayes, supra.[7]
Nevertheless, the judgment sought shall still be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966.

IV.
The Louisiana Supreme Court has held that federal substantive admiralty or maritime law applies to Jones Act or general maritime law claims instituted in a Louisiana state court. Lejano v. K.S. Bandak, 97-0388 (La.12/12/97), 705 So.2d 158; see also Spangler v. North Star Drilling Co., 552 So.2d 673 (La.App. 2d Cir.1989), citing Lavergne v. Western Co. of North America, Inc., 371 So.2d 807 (La.1979). However, aside from the Louisiana Supreme Court, the United States Supreme Court is the only federal court whose decisions are binding upon this court; the decisions of the lower federal courts are only persuasive authority. David W. Robertson, Admiralty and Maritime Litigation in State Court 55 La. L.Rev. 685 (1995). Nevertheless, as noted by our brethren on the Third Circuit, "where ... the precise issue before us has been dispositively addressed in the intermediate federal appellate court that covers the same geographical area as this court, we should be extremely hesitant to differ with the federal court." Gaspard v. Transworld Drilling Co., 468 So.2d 692 (La.App. 3d Cir.), writ denied 474 So.2d 1304 (La.1985), cert denied 475 U.S. 1067, 106 S.Ct. 1382, 89 L.Ed.2d 607 (1986). Moreover, the U.S. Fifth Circuit Court of Appeals and its judges have long been recognized as the premier circuit from which maritime and admiralty jurisprudence emanate. Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (Douglas, J., dissenting); Frank L. Maraist, Symposium: Maritime Personal Injury, 43 La. L.Rev. 847 (1983).
Although the term "vessel" is not defined by the Jones Act, is incapable of precise definition, and has been the subject of many law review articles and federal maritime cases,[8] our task is simplified by the U.S. Fifth Circuit Court of Appeals' decision in Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560 (5th Cir.1995), consolidated with Ketzel v. Mississippi Riverboat Amusement, Ltd., 867 F.Supp. 1260 (S.D.Miss.1994). In separate actions, plaintiff Pavone and plaintiff Ketzel, employed as a bartender and cocktail waitress respectively, sued under the Jones Act and under general maritime law after being injured in unrelated accidents while employed on the Biloxi Belle, a floating dockside casino.[9]Pavone, *909 52 F.3d at 562-3. Two separate district courts granted defense motions for summary judgment finding that the Biloxi Belle was not a Jones Act vessel. Id. at 563, 568. Although the Fifth Circuit agreed with the results, it expressed apprehensions that the "classical maritime methodology" for determining vessel status performed by the district courts might have an adverse effect in future cases. Id. at 568. Instead, the court stated that an analysis of putative vessels that were either "withdrawn from navigation"[10] or were being used as "work platforms"[11] would be a more principled method to determine vessel status. Id. The court remarked that the adopted approach avoids the conflict in vessel status among the Jones Act, general maritime law, state casino licensing classification, Coast Guard documentation, and dictionary definitions. Id. at 568, n. 23.
Despite the fact that the Biloxi Belle was not originally constructed to be a casino, once it arrived in Biloxi, it has been continued to be indefinitely moored before, during and after the accidents. Furthermore, the fact that the casino had at one time moved across navigable waters to avoid the threat of a hurricane was a movement purely incidental to the primary purpose of operating as a dockside casino structure. The Pavone court then stated that:
When the undisputed facts of the instant cases are plugged into (1) the Desper/Hawn withdrawn from navigation factors, [see n.10] or (2) the Bernard/Gremillion workplatform attributes, [see n.11] or both, and are compared to the functional and nautical characteristics and mooring statuses of the various craft that in earlier cases were held as a matter of law to be nonvessels for Jones Act purposes, there can be little doubt that indefinitely moored, shore-side, floating casinos, such as the [Biloxi Belle ], must be added to that list. Pavone, 52 F.3d at 570. (emphasis added).
Following in the wake of Pavone came McAdow v. Promus Companies, Inc., 926 F.Supp. 93 (W.D.La.1996), where the district court sitting in Shreveport and applying the Pavone approach held that the casino riverboat Shreveport Rose[12] was both removed from navigation and a work platform before, during, and after plaintiff's alleged injury. Id. at 95. The court commented on the casino's connection to the shore noting that mobility could be achieved only by removing the steel pins from the access ramps, severing all lines and cables, and lifting the gate of the coffer cell by use of a crane barge. Id. Furthermore, the decision focused on the fact that the Shreveport Rose had not been used to transport cargo or passengers over navigable waters (except on the two occasions it arrived in and departed from Shreveport), nor was intended to be used as such. Thus, the court concluded that this "land-based *910 casino" was not a Jones Act vessel. Id. at 96.
A similar result obtained in King v. Grand Casinos of Mississippi, Inc.-Gulfport, 697 So.2d 439 (Miss.1997), where the Mississippi Supreme Court, in adopting the Pavone approach, held that the Grand Casinos, a floating shore-side casino, was not a Jones Act vessel. Moreover, a bankruptcy court also citing Pavone held that the neither the Treasure Bay Tunica nor the Treasure Bay Biloxi, both floating shore-side casinos as well, were Jones Act vessels. In re Treasure Bay Corp., 205 B.R. 490, (Bankr.S.D.Miss.1997).
Turning to the facts in the instant case, we find that the Lady of the Isle has been removed from navigation and is a work platform. Since its arrival in Shreveport, the Lady of the Isle has neither left its containment pond nor has been used to transport cargo or passengers across navigable waters. It is not refuted that the sole purpose of the Lady of the Isle is to operate as a gaming establishment; it was specifically built for casino operations. Moreover, the Lady of the Isle enjoys a statutory exemption from Louisiana Riverboat Economic Development and Gaming Control Act's cruising requirements. La. R.S. 27:65 B. And although the casino plans to temporarily leave its containment pond in 1999 solely for the purpose of undergoing a mandatory hull inspection, such scheduled movement is incidental to the casino's primary purpose of serving as a gaming establishment. Cf. Pavone, supra 52 F.3d at 570 (commenting on the casino's one-time evacuation due to a hurricane threat).
Similar to the facts in Pavone, McAdow, Grand Casinos, and Treasure Bay, the Lady of the Isle is connected to the land and/or moored by access ramps, utility lines, and steel cables with concrete filled moorings. Even more fatal to the Lady's claimed Jones Act vessel status is the fact that it is enclosed in a containment pond, insulated from tidal effects, and requires the permission of the U.S. Army Corps of Engineers to remove the sediment that has built up along the weir gate, in addition to removing the gate itself, to allow the Lady of the Isle to leave its present position.
Admittedly, there are some factual differences between the Lady of the Isle and the casino boats involved in the aforementioned analogous cases[13] that at first glance might seem to suggest a result opposite from the one reached today. First, the Lady of the Isle has a propulsion system[14] and a crew that is on duty 24 hours a day. However, these facts merely support the illusion that the Lady of the Isle is a 19th Century Riverboat, albeit one in a bottle. Secondly, Chase was not a waiter or bartender but the chief engineer engaged in maintenance and cleaning work on the vessel when injured. However, Chase's job description does not determine vessel status. And on a different note, had this event occurred while the Lady of the Isle was in transit, we may well have reached a different outcome,[15] but the unmistakable conclusion is that it was not being used for any transportation function before, during and after the accident.

*911 V.
Chase also argues on appeal that because the Louisiana Riverboat Economic Development and Gaming Control Act[16] ("the Gaming Act") permits riverboat casinos to operate only on "vessels," the Lady of the Isle must be considered to be a Jones Act vessel to comply with the Gaming Act.[17] Under the Gaming Act, a riverboat is designed as a "vessel" which:
(a) Carries a valid Certificate of Inspection issued be the United States Coast Guard with regard to the carriage of passengers on designated rivers and waterways within or contiguous to the boundaries of the State of Louisiana.
(b) Carries a valid Certificate of Inspection from the United States Coast Guard for the carriage of a minimum of six hundred passengers and crew.
(c) Has a minimum length of one hundred fifty feet.
(d) Is of such type and design as to replicate as nearly as practicable historic Louisiana river borne steamboat passenger vessels of the nineteenth century era. It shall not, however, be a requirement that the vessel be steam-propelled or maintain overnight facilities for its passengers.
(e) Is paddlewheel driven.[18]
However, Chase's argument is without merit. The meaning of "vessel" to comply with the Gaming Act has an entirely different context and purpose than the meaning of vessel for Jones Act purposes. See Grand Casinos, supra, 697 So.2d at 442. The determination of vessel status for purposes of invoking federal maritime law will not be influenced by a state's legislatively induced licensing scheme. King v. The President Riverboat Casino-Mississippi, 894 F.Supp. 1008 (S.D.Miss.1995); see also Grand Casinos, supra, 697 So.2d at 442-3. Furthermore, the Gaming Act makes no reference to the Jones Act in defining the term "vessel."

VI.
Therefore, we hold that at the time Chase suffered his alleged injury, the Lady of the Isle was not a vessel for Jones Act or general maritime law purposes. The writ is made peremptory, and summary judgment is granted in favor of the Isle of Capri. Appellate costs are assessed to the plaintiff Robert Lee Chase.
WRIT MADE PEREMPTORY; REVERSED AND RENDERED.
BROWN, J., dissents with reasons.
BROWN, Judge, dissenting.
The trilogy of heightened legal protections afforded injured seamen are: 1) a warranty of seaworthiness, similar to strict liability, by the vessel owner; 2) the right to maintenance and cure, a kind of nonstatutory workers' compensation, from the employer regardless of fault; and, 3) a negligence action against the seaman's employer under the Jones Act. Chandris, Inc. v. Latsis, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314, (1995).
The Jones Act is a federal statute providing that "[A]ny seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages ..." 46 U.S.C.A.App. § 688(a). The key to recovery under the Jones Act and the general maritime law is the term "seaman." The term, however, is not defined in the statutes.
In McDermott International v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991), the supreme court attempted to bring clarity to "the myriad of standards and lack of uniformity" in determining seaman status. To qualify for seaman status the worker had to be more or less permanently connected to a vessel in navigation and contribute to the *912 vessel's function. The court emphasized that the "aid in navigation" test was no longer applicable, stating that, "it is not necessary that a seaman aid in a navigation or contribute to the transportation of a vessel, but a seaman must be doing ship's work." McDermott, at 355, 111 S.Ct. at 817-18.
The plaintiff in the present case is a quintessential seaman. He was chief engineer on the boat, not a land-based employee, such as a bartender, cocktail waitress or change attendant; was permanently connected to the vessel; did ship's work and contributed to that vessel's obligatory function of transporting passengers; and, was injured in this capacity. Plaintiff was not a "probable or expected seaman but (was a) seaman in being." Desper v. Starved Rock Ferry Company, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952).
Pavone v. Mississippi Riverboat Amusement, 52 F.3d 560 (5th Cir.1995), recognized that workers assigned to a vessel to conduct its shore enterprise, gambling, may be seamen when the boat is actually in transit. In the instant case, plaintiff did not work in the shore enterprise but manned the wheel (in a manner of speaking) of the vessel to accomplish its obligation to be capable of carrying passengers on navigable waters.
The Lady of the Isle was a functional vessel fully equipped with all necessary propulsion, safety and navigation equipment. It was licensed and inspected by the Coast Guard. It maintained a full marine crew with the captain or chief mate present on the bridge at all times. The barge in Pavone, originally a restaurant, was towed into place, semi-permanently moored to the shore and manned by land-based personnel engaged solely in the operation of a casino.
Louisiana law required that the Lady of the Isle be certified by the U.S. Coast Guard as a vessel capable of carrying a minimum of six hundred passengers and crew. The Lady was not, nor could it legally be, a "dead ship" removed or withdrawn from navigation. It was ready to go and committed to navigation as required by Louisiana gaming laws. Plaintiff's job specifically contributed to the boat's legally imposed mission of carrying a minimum of six hundred passengers and crew.
It is fundamental that to obtain seaman status there must be a connection to a vessel. The term, however, is not defined by statute. Traditionally the term vessel in navigation meant engagement in commerce or transportation on navigable waters. In practice, however, a vessel does not have to be on the bounding main at the moment of the accident, but rather its operational status is the salient factor. The jurisprudence requires only that the vessel be committed to navigation by its owner. McDermott, supra; Chandris, Inc., supra; Wright v. Ocean Drilling and Exploration Company, 461 So.2d 1084 (La.App. 4th Cir.1984).
Further, the jurisprudence has consistently held that the inquiry into seaman status is of necessity fact specific and for the jury whose decision should not be disturbed absent exceptional circumstances. Rather than a "snapshot" approach, the jury must consider the "total circumstances" bearing on the maritime employee's substantial connection to the vessel and contribution to the vessel's function. Chandris, Inc., supra.
In Benetrix v. Louisiana Riverboat Gaming Partnership, d/b/a Isle of Capri Casino, 1995 WL 867854 (W.D.La. Nov.7, 1995), plaintiff, a casino change attendant, was injured while working on the same Lady of the Isle and brought an action in federal court under the Jones Act and general maritime law. In denying defendant's motion for summary judgement, the district court found that, "[T]he differences in the `Biloxi Belle' (Pavone, supra) and the `Lady of the Isle' are obvious and glaring." The court further found that the Lady of the Isle had not been withdrawn from navigable waters.
I respectfully dissent.
NOTES
[1] Also named as defendants were the Louisiana River Site Development, Inc., CSNO, Inc., Casino America, Inc., Louisiana Downs, Inc., and ITT Hartford Life and Annuity Insurance Co. Chase alleges that all these entities, either individually or concurrently or with some other person or entity, were the employer or employer pro hac vice and/or vessel owner or vessel owner pro hac vice in relation to the instant petition.
[2] 46 U.S.C.A.App. § 688.
[3] The determination of whether a structure constitutes a "vessel" for Jones Act purposes or for general maritime law purposes is the same. See Pavone, infra.
[4] Prior to the Lady of the Isle's arrival, a pond measuring 205' × 360' was formed by excavating earth alongside the Red River. The ground separating the river from the "pond" was then removed allowing both the river waters and the boat to move into the pond.
[5] Chase generally disputes the magnitude of the burdens imposed by the cofferdam and the weir gate in moving the casino out of its present location; however, such dispute does not impinge upon any material fact as explained below.
[6] The issue presented in this case is ripe for review. In addition, district courts have rendered conflicting opinions and reasons. See Rogers v. Louisiana Riverboat Gaming Partnership d/b/a Isle of Capri Casino, CA# 406, 803 First Judicial District Court (7/29/97) (citing Pavone and McAdow) and Zornes v. Louisiana Riverboat Gaming Partnership d/b/a Isle of Capri Casino, CA# 406, 689 First Judicial Court (2/6/97) where both cases granted summary judgment finding that the Lady of the Isle is not a Jones Act vessel. However, see Womack v. Louisiana Riverboat Services, Inc., CA# 92, 254 26th Judicial District Court in which a summary judgment motion contending that the Horshoe Casino riverboat is not a Jones Act vessel was denied.
[7] In the instant case, the trial judge denied the summary judgment motion on June 20, 1997, taking cognizance of Act 9 but citing Walker v. Kroop, 678 So.2d 580 (La.App. 4th Cir. 7/24/96) for the proposition that the criteria for granting summary judgment have not changed. Although Kroop has been criticized and overruled (see Pitre, supra; Acts 1997 No. 483 § 5), insofar as the non-movant, Chase, has provided factual evidence to support his burden to prove the Lady of the Isle is a Jones Act vessel, the impact of Act 9 and Act 483 is minimal.
[8] See, generally Jack L. Allbritton and David W. Robertson, Seaman Status after Chandris, Inc. v. Latsis, 8 U.S.F. Mar. L.J. 29 (1995); Brett D. Wise, Comment, Vessel Classification and the Work Platform Exception, 70 Tul. L.Rev. 691 (1995); Hon. Peter Beer, Keeping up with the Jones Act, 61 Tul. L.Rev. 379 (1986).
[9] Constructed in Morgan City, Louisiana and originally designed to a be a floating restaurant, the structure, initially named the Wayward Lady, was towed to four different locations, one as far south as Corpus Christi, Texas, before being re-outfitted as a casino, towed to Biloxi, Mississippi, and renamed the Biloxi Belle. The boat was moored to the shore by sunken steel pylons filled with concrete and connected to the land by steel ramps, an adjoining building, and various utility lines (telephone, electric, gas, sewer, domestic fire and water, cable TV, and computer).

The Biloxi Belle has a steel hull, a raked bow (to facilitate towing), bilge pumps, ballast tanks, auxiliary generator, below deck storage facilities, and a galley for employee meals and work breaks. It is documented by the U.S. Coast Guard, approved to undertake voyages between U.S. ports with no restrictions, licensed for gaming pursuant to the Mississippi Gaming Control Act which only issues such licenses to operators of "vessels," and has a contract to be towed to sheltered waters in the event of a damaging weather forecast.
However, the Biloxi Belle has no engine, no captain, no navigational or nautical crew, no navigational aids, no crewquarters and no lifesaving equipment. Its pilot house is for decorative purposes only as is its paddlewheel.
[10] See Desper v. Starved Rock Ferry Co., 342 U.S. 187, 191, 72 S.Ct. 216, 218, 96 L.Ed. 205 (1952) (craft "laid up for the winter"), quoting Hawn v. American S.S. Co., 107 F.2d 999, 1000 (2nd Cir. 1939). See also John Munch, Comment, From the "Dead Ship" Doctrine to Vessels "In Navigation": One Changing Aspect in Determining Admiralty Jurisdiction and Available Maritime Remedies, 70 Tul. L.Rev. 717 (1995).
[11] The three common factors to work platforms are: (1) the structure was constructed to be used as a work platform or was used primarily as a work platform at the time in question; (2) the structure is moored or otherwise secured at the time of the accident; and (3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose. See Pavone, 52 F.3d at 569-70 citing the trilogy of cases on work platform analysis: Gremillion v. Gulf Coast Catering Co., 904 F.2d 290 (5th Cir.1990); Ducrepont v. Baton Rouge Marine Enterprises, Inc., 877 F.2d 393 (5th Cir. 1989); Bernard v. Binnings Constr. Co., 741 F.2d 824 (5th Cir.1984).
[12] The Shreveport Rose was constructed in Morgan City, Louisiana, and traveled to Shreveport with the assist of tugs, although the Coast Guard certified boat has the capacity for movement on its own. The casino has a pilothouse and a radar unit, but no galley, and no crew quarters. Since its arrival in Shreveport in 1994, it was moored in a coffer cell in the Red River and connected to the shore by four steel cables. Steel ramps allowed access to the Shreveport Rose; utilities lines provided power.
[13] In Benetrix v. Louisiana Riverboat Gaming Partnership, d/b/a Isle of Capri, Civil Action No. 95-0453, 1995 WL 867854 (W.D.La. Nov.7, 1995), District Court Judge Donald E. Walter denied a motion for summary judgment involving the Jones Act status of the Lady of the Isle. The decision opined that defendant's reliance upon Pavone was misplaced because of the factual differences between the Biloxi Belle and the Lady of the Isle. However, we agree with the reasoning of Judge Stagg who stated in McAdow that "regardless of any structural dissimilarities between the [Biloxi Belle ] and the [Shreveport Rose ], the approach of Pavone is certainly controlling." McAdow, 926 F.Supp. at n. 1.
[14] Apparently, the Shreveport Rose is the only other floating casino containing a propulsion system, although the McAdow decision did not elaborate on its technical capacities. McAdow, 926 F.Supp. at 94.

However, the mere capacity to float or move across navigable waters does not necessarily make a structure a Jones Act vessel. Bernard, supra, 741 F.2d at 830-1.
[15] See supra, Allbritton note 8, at 54 for the proposition that the Pavone decision implies that one who lacks seaman status in relation to a stationary watercraft may subsequently achieve seaman status the moment the craft initiates movement. See also DiGiovanni v. Traylor Brothers, Inc., 959 F.2d 1119 (1st Cir.) (en banc), cert. denied 506 U.S. 827, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992).
[16] La. R.S. 27:41.
[17] Chase also argued that the Isle of Capri's position that the casino is not moored on a navigable water body or the Red River, thus taking the casino out of navigable waters, a Jones Act requirement, is flawed because the Gaming Act requires the casino to be in the river. However, we need not decide whether the casino is technically in the Red River or not to resolve the vessel status issue in this case, and in any event, Isle of Capri's counsel at oral argument conceded that the casino was on a navigable water body.
[18] La. R.S. 27:44(23).