# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 02-3818 & 02-3819

JOHN HOWARD, *et al.*,

*Plaintiffs-Appellees,*

v.

SOUTHERN ILLINOIS RIVERBOAT CASINO CRUISES, INC.,
doing business as PLAYERS ISLAND CASINO,

*Defendant, Third-Party Plaintiff-Appellant,*

v.

TRIANGLE ENTERPRISES, INC., doing business as
TRIANGLE INSULATION AND SHEET METAL COMPANY,

*Third-Party Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Southern District of Illinois.
Nos. 00 C 4321 & 01 C 4299—**G. Patrick Murphy**, *Chief Judge.*

_____

ARGUED MAY 20, 2003—DECIDED APRIL 9, 2004

_____

Before COFFEY, KANNE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* This controversy arose when 46 individual plaintiffs brought negligence claims

under the Jones Act, 46 U.S.C. app. § 688(a), for injuries they allegedly sustained while working aboard a riverboat casino, the *M/V Players II* (*Players II*). *Players II* was permanently moored to the dock at all times pertinent to their claims. The question we must decide is whether this fact is enough to defeat any claim under the Jones Act, which creates a federal negligence remedy for seamen. The district court thought not, but it certified under 28 U.S.C. § 1292(b) the following question for interlocutory review: whether *Players II* was a vessel "in navigation" covered by the Jones Act, such that the plaintiffs employed on board were Jones Act "seamen." We agreed to hear the appeal, and we now reverse.

## I

Beginning in 1995, defendant Players Island Casino (Players) operated a gaming casino on *Players II*, a riverboat casino located on the Ohio River near Metropolis, Illinois. At that time under Illinois law, gaming casinos could be operated only on licensed self-propelled excursion boats that cruised along navigable streams. In 1999, the Illinois General Assembly amended the Illinois Riverboat Gambling Act to allow gaming on "permanently moored" barges. 230 ILL. COMP. STAT. 10/4(d) & 10/3(c). Soon thereafter, *Players II* ceased cruising along the Ohio River and (with minor exceptions described below) was permanently moored to the dock. According to an affidavit by the vice president of operations and marketing, Jeff Pfeiffer, Players had no intention of having *Players II* cruise again as part of casino operations.

Plaintiffs claim that they sustained injuries when they were exposed to chemicals while working aboard *Players II* on July 28 and 29, 2000. It is undisputed that at the time of the plaintiffs' alleged injuries, the casino had been docked for more than a year and was not in the business of

transporting passengers. It was connected to land-based utilities, including electricity, telephone, water, and sewer. Nevertheless, it could be disconnected from the dock in about 15 to 20 minutes. Moreover, *Players II* was licensed and classified as a passenger vessel with the U.S. Coast Guard and was equipped with firefighting and safety equipment. It also employed a captain and crew qualified to move the casino if necessary. After the 1999 change in Illinois law allowing dockside gaming, however, *Players II* never left its moorings except in connection with propulsion tests required by the Coast Guard. During the propulsion tests (which took about 45 minutes to complete), *Players II* would move out into the river about 100 feet and then return to the dock. By the time of plaintiffs' alleged injuries, the Coast Guard required the propulsion test only once a year. In September 2001, Players removed *Players II* from service as a casino. Some time later, it sailed under its own power to Texas to await sale.

Defendant Players and third-party defendant Triangle Insulation and Sheet Metal Company (Triangle) filed motions for summary judgment in district court, seeking dismissal of the plaintiffs' claims on the grounds that *Players II* was not a vessel "in navigation" and thus the plaintiffs were not "seamen" protected by the statute. The district court denied Players' and Triangle's motions for summary judgment and certified this issue for interlocutory appeal under 28 U.S.C. § 1292(b).

## II

The Jones Act creates a federal negligence claim for any "seaman" injured in the course of employment. 46 U.S.C. app. § 688(a). Congress enacted the Jones Act to provide seamen with heightened legal protection because of their exposure to "perils of the sea." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). Oddly enough, the term "seaman" is

not defined in the statute; instead, it has been up to the courts to define that central term. The Supreme Court has established two requirements for seaman status: (1) the employee's duties must contribute to the function of the vessel or to the accomplishment of its mission; and (2) the employee must have a "substantial employment-related connection to a vessel *in navigation*." *Id.* at 373 (emphasis in original); *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 354-55 (1991). As the Supreme Court noted in *Chandris*:

> The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

515 U.S. at 369.

The only question before us today is whether an indefinitely moored vessel that has the ready capability of cruising, but that is not used or intended to be used for the purpose of moving or transporting, qualifies as a vessel in navigation. To be precise, it is clear that *Players II* is a vessel; what is contested is whether that vessel is "in navigation." We are aware that the Supreme Court has granted *certiorari* in *Stewart v. Dutra Construction Co.*, 2004 WL 323176 (U.S. Feb. 23, 2004), which presents the question whether a special-purpose dredge is a Jones Act "vessel." See Pet. for Writ. of Cert., 2003 WL 22926387 (U.S. Dec. 3, 2003) (No. 03-814). That question, however, is distinct from the question whether a conventional sea-faring craft is "in navigation," as opposed to "out of navigation" or "withdrawn from navigation." *Chandris*, 515 U.S. at 373-74. Because the latter question is the one presented in this case, we see no need to postpone our decision for the resolution of

*Stewart.* The navigation issue, the Court held in *Chandris*, is normally one of fact reserved for the jury. *Id.* at 373. As is generally true, however, it is appropriate to remove that issue from the jury if there is no genuine issue of material fact and the law will reasonably support only one conclusion. *Id.*

The district court concluded that *Players II*'s indefinite mooring did not compel the finding that it was not in navigation. Giving little weight to *Players II*'s purpose or actual use, the district court focused instead on the fact that *Players II* was ready and able to cruise at 15-20 minutes' notice. It found this case to be distinguishable from *Pavone v. Mississippi Amusement Corporation*, 52 F.3d 560 (5th Cir. 1995) (analyzing same issue for floating dockside casino not ready and able to cruise, and holding that the vessel was not in navigation), and *Chase v. Louisiana Riverboat Gaming Partnership*, 709 So. 2d 904 (La. App. 1998) (same), because *Players II* was ready and able to cruise. Citing language in *Johnson v. John F. Beasley Construction Company*, 742 F.2d 1054 (7th Cir. 1984), the district court also found support for *Players II*'s "in navigation" status because the vessel was literally engaged as an instrument of commerce as it floated on the Ohio River, obviously a navigable body of water. *Id.* at 1063. Finally, the district court noted that it was only by virtue of its status as a vessel that *Players II* could operate as a gambling casino. See 230 ILL. COMP. STAT. 10/3-10/4.

While we appreciate the district court's care in considering this question, in the end we are persuaded that *Chandris* requires a more pragmatic approach than the one the court used. As we recognized in *Johnson*, in order for a vessel to satisfy the navigation requirement, the purpose of the vessel "must to some reasonable degree be the transportation of passengers, cargo, or equipment from place to place across navigable waters." *Johnson*, 742 F.2d at 1063 (internal citations and quotations omitted).

Moreover, the analysis in *Pavone* and *Chase* did not hinge upon whether the vessel was ready and able to cruise, but looked to the vessel's purpose and actual use (whether it was used to move or transport anything). *Pavone*, 52 F.3d at 570; *Chase*, 709 So. 2d at 910. Finally, whether a ship is a vessel for state law gambling purposes, while perhaps one factor to take into account, does not govern the question whether it is a vessel in navigation for purposes of the Jones Act.

Unlike the vessels in navigation that have been the subject of decisions of this court and the Supreme Court, the purpose of *Players II* was not to move or transport cargo or people, but merely to provide a legal venue under Illinois law for gambling. Recognizing that indefinitely moored dockside casinos are not the kind of vessels that the Jones Act addresses is consistent with the statute's purpose of enhancing legal protections for seamen "regularly" exposed to the "perils of the sea." See *Chandris*, 515 U.S. at 369. We hinted at this conclusion in our earlier decision in *Weaver v. Hollywood Casino-Aurora, Inc.*, where we remarked that "[i]f the casino were indefinitely moored (as the record suggests it now is), its status as a vessel in navigation would be doubtful." 255 F.3d 379, 387 (7th Cir. 2001). Today we hold that an indefinitely moored dockside casino with no transportation function or purpose is not a vessel "in navigation." See *Martin v. Boyd Gaming Corp.*, 252 F.Supp.2d 321, 323 (E.D. La. 2003); *Grobe v. Hollywood Casino-Aurora, Inc.*, 759 N.E.2d 154, 159-60 (Ill. App. Ct. 2001); see also *Johnson*, 742 F.2d at 1063 ("If the waterborne structure serves no transportation function, of course, it can have no group performing navigational functions, and hence no maritime 'crew.'"); *Tonnesen v. Yonkers Contracting Co., Inc.*, 82 F.3d 30, 36 (2d Cir. 1996) (ignoring original purpose for which the floating structure was constructed and focusing on whether the floating structure was primarily used for transportation purposes

during a reasonable period of time immediately preceding the accident). In applying this test, courts will need to examine, among other factors, the current use of the vessel and the question "whether the owner intends to move the structure on a regular basis and the length of time the structure has remained stationary." *Grobe*, 759 N.E.2d at 159.

In this case, the undisputed facts doom the plaintiffs' claims. *Players II* was an indefinitely moored dockside casino at the time of the alleged injuries and was never moved except to be tested. As a matter of law, we conclude that it was not "in navigation" for purposes of the Jones Act, and thus that these plaintiffs were not within the class protected by that statute.

## III

The order of the district court denying summary judgment to Players and Triangle is REVERSED, and the case is REMANDED for entry of judgment in their favor.

A true Copy:

       Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*